RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name:

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

TIMOTHY FINLEY,

                        *Plaintiff-Appellant*,

    *v.*

ERICA HUSS, Deputy Warden, Marquette Branch Prison; SARAH SCHROEDER, Acting Deputy Warden, Marquette Branch Prison,

                      *Defendants-Appellees*.

> No. 23-1083

Appeal from the United States District Court for the Western District of Michigan at Marquette.
No. 2:18-cv-00100—Robert J. Jonker, District Judge.

Argued:  March 20, 2024

Decided and Filed:

Before:  GILMAN, McKEAGUE, and THAPAR, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Christine A. Monta, RODERICK & SOLANGE MACARTHUR JUSTICE CENTER, Washington, D.C., for Appellant.  Joshua S. Smith, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellees.  **ON BRIEF:**  Christine A. Monta, Daniel M. Greenfield, RODERICK & SOLANGE MACARTHUR JUSTICE CENTER, Washington, D.C., Aaron Littman, UCLA SCHOOL OF LAW, Los Angeles, California, for Appellant.  Joshua S. Smith, Keith G. Clark, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellees.

    McKEAGUE, J., delivered the opinion of the court in which GILMAN and THAPAR, JJ., concurred in different parts.  GILMAN, J. (pp. 42–46), delivered a separate opinion concurring in part and dissenting in part.  THAPAR, J. (pp. 47–52) also delivered a separate opinion concurring in part and dissenting in part.

———————————

**OPINION**

———————————

McKEAGUE, Circuit Judge.    Timothy Finley is serving a Michigan prison sentence while suffering from severe psychiatric disorders.  Over several weeks in 2016, Finley's mental health hit a breaking point: he repeatedly cut himself with—and swallowed—multiple razorblades.    At the same time, his persistent misconduct made him difficult to manage.  Eventually, prison officials placed Finley in a heavily restrictive cell in administrative segregation and kept him there for approximately three months.  Finley now challenges that decision.  He brought this action under 42 U.S.C. § 1983, alleging violations of the Eighth Amendment and his right to procedural due process.  He also included disability-discrimination claims under the Americans with Disabilities Act and the Rehabilitation Act.

Finley targets two prison decisionmakers.  Erica Huss, the deputy warden, assigned Finley to administrative segregation.  Then Sarah Schroeder, who temporarily served as deputy warden during Huss's leave of absence, kept Finley in administrative segregation for months.  Both officials knew about Finley's serious mental-health problems and repeated instances of self-harm.  In addition, Huss made her decision despite a warning from Finley's mental-healthcare provider that solitary confinement was likely to worsen his mental health.  And Schroeder failed to carry out the mental-healthcare provider's request that Finley be promptly transferred to a treatment program.  In the process, both deputy wardens likely violated Michigan's correctional policies about mentally ill inmates in solitary confinement.

The district court granted summary judgment to Huss and Schroeder on all claims.  We agree that summary judgment was warranted for Finley's procedural due process and statutory discrimination claims.  But summary judgment was improper for Finley's Eighth Amendment claim because he presented evidence sufficient to find that the deputy wardens violated his clearly established rights.  We thus **AFFIRM** in part, **REVERSE** in part, and **REMAND** for further proceedings.

# I. BACKGROUND

Timothy Finley's appeal revolves around events that took place between August 2016 and January 2017 during his incarceration at a Michigan Department of Corrections (MDOC) facility. Finley's claims hinge on two key decisions made by a pair of prison officials: Erica Huss's decision to place him in administrative segregation, and Sarah Schroeder's decision to keep him there for months.

## A.    Prison Policies on Segregation and Mental Health

Before delving into the specifics of Finley's case, we briefly overview MDOC's policies and programs on segregated housing and mentally ill inmates. Key here, segregation is a form of solitary confinement used to physically separate inmates with special management needs from the general population. It can be either administrative or punitive. Although "administrative segregation" isn't technically a form of punishment, it is often triggered by instances of serious misconduct.

MDOC has specific rules designed to keep mentally ill inmates out of administrative segregation. That aligns with the overwhelming medical consensus that solitary confinement, though harmful to even mentally stable inmates, is particularly devastating for those with severe psychiatric disorders. Accordingly, MDOC staffs its prisons with mental-health professionals who monitor and treat inmates with mental illnesses. By rule, prison officials cannot place a mentally ill inmate into administrative segregation without first consulting a mental-health professional about whether that inmate's mental-health needs can be met in segregation. *See* Mich. Dep't of Corr., Policy Directive 04.05.120 ¶ N. The rules also stress that mentally ill inmates should not ordinarily be housed in segregation if their illnesses might prevent proper adjustment to solitary confinement. *See* Mich. Dep't of Corr., Policy Directive 04.06.182 ¶ D.

MDOC recognizes that some mentally ill inmates might be impossible to manage outside of a segregation unit. In such cases, mental-health professionals must closely monitor the inmate to ensure that his or her needs are met in segregation. *See id.* If a mental-health professional decides that an inmate needs medical care instead of segregation, the rules prescribe various steps depending on the specific medical recommendation. *Id.* ¶¶ H–L. When an inmate requires

intensive inpatient mental health services, he or she must be released from segregation as soon as possible. For other recommended treatment settings, prison officials get more flexibility—but if they agree with the recommendation, they must release the inmate from segregation within three business days. *Id.*

MDOC operates several treatment-oriented programs that it deems more appropriate than segregation for those with serious mental illnesses. For severe cases, inpatient psychiatric services and the Residential Treatment Program are available. Outpatient programs also exist. Some, like the Secure Status Outpatient Treatment Program, are designed specifically for inmates who cannot be safely integrated with others. And most relevant to Finley, the Interim Care Program is an outpatient program created to remove mentally ill inmates from administrative segregation and instead place them—for their own wellbeing—into general population settings. Inmates participating in the Interim Care Program enjoy fewer restrictions than their counterparts in administrative segregation. However, the record is unclear about the specific differences.

## B.      Finley's Mental Illness and Misconduct

Finley has a long history of mental illness. Among other things, doctors have diagnosed him with bipolar and major depressive disorders. Finley's MDOC medical records are replete with various diagnoses, medical reports, and suicide-risk evaluations. He has attempted suicide multiple times—twice while incarcerated. At the same time, Finley also has a long history of misconduct in prison. Over the course of about twenty years in various MDOC facilities, he accumulated a lengthy rap sheet of serious rule violations. That misbehavior, combined with his serious mental illnesses, sometimes led prison officials to face difficult situations.

In May 2016, MDOC officials transferred Finley to Marquette Branch Prison—a high-security facility in northern Michigan capable of confining particularly challenging inmates. Mandi Salmi, a registered nurse, became Finley's assigned mental-health professional. Finley was initially placed in the Secure Status Outpatient Treatment Program, where he received mental-health treatment. He left the program in June and joined the general population.

Finley's mental health reached a breaking point in late August 2016. He told prison staff that he was experiencing thoughts of self-harm, and officials promptly placed him in a suicide-observation cell. Finley somehow managed to sneak a razorblade into the cell. Despite his near-constant supervision, Finley repeatedly used the razor to cut himself for two straight days. He wrote on the cell's walls with his own blood. Finley then swallowed the razor, and it became lodged in his throat. Prison officials kept Finley in suicide observation for the next week, interrupted by two separate hospital trips where doctors tried—but ultimately failed—to surgically extract the razor. During this time and in the following weeks, Finley refused to take some of his prescribed medications as directed.

On September 6, Finley (still in suicide observation) discussed mental-health treatment options with a prison psychiatrist and the resident unit manager. Both officials recommended the Residential Treatment Program, an intensive treatment setting. Finley then asked Salmi to refer him to that program. When she refused, he asked her to refer him to the Interim Care Program instead. He was not referred to either program. Salmi reasoned that the Residential Treatment Program wasn't yet clinically warranted, and that the Interim Care Program was unavailable to inmates outside of administrative segregation.

Finley returned to the general population the next day. Then, on September 8, a correctional officer found makeshift metal tools (used for television repair) in Finley's cell. Prison officials charged Finley with possessing a weapon and placed him in temporary administrative segregation pending the outcome of a misconduct hearing. Segregation triggered immediate self-harm. Within an hour or two, Finley started cutting himself with another razorblade and wrote "death" on the wall with his blood. He told Salmi that he was considering hanging himself. Salmi decided that Finley was at a moderate risk of suicide, documented that in her suicide-evaluation report, and moved Finley back to a suicide-observation cell.

Finley stayed in suicide observation for the next nine days. Over that period, he repeatedly cut himself, overdosed on medication, and swallowed more razors. He also accumulated a pair of sexual-misconduct charges for masturbating in his cell. Hearing officers found Finley guilty of both sexual-misconduct charges, as well as his earlier weapon-possession

charge.  The punishment imposed for all three violations was "loss of privileges," meaning that Finley lost access to entertainment, exercise facilities, visitors, and other amenities.

Erica Huss visited Finley in his suicide-observation cell on September 14.  As deputy warden, Huss chaired the prison's Security Classification Committee—the panel tasked with deciding whether difficult inmates should be classified to administrative segregation.  Finley's recent weapon-possession violation had triggered a Committee meeting.  But Huss assured Finley that, because of his mental health, she wouldn't place him in administrative segregation.  She acknowledged that Finley couldn't stand segregation and decided to "give [him] another chance."  Finley Dep., R.88-4 at PageID 697–98.  A few days later, Finley left suicide observation and returned to the general population.

On September 18—the day after Finley rejoined the general population—a prison guard erroneously issued him a shaving razor.  Finley refused to return the blade.  Officials searched for the razor and, when they failed to find it, placed Finley in a suicide-observation cell.  Finley then revealed the hidden razor, cut himself several times, and swallowed it.  Again, the blade lodged itself in Finley's throat.  Finley underwent another round of emergency surgery; doctors successfully removed the newly ingested razor from Finley's throat and at least one other razor from his stomach, but they failed to extract the still-embedded first razor.  Upon returning from surgery, Finley spent the next few days in suicide observation.

Prison officials charged Finley with possessing dangerous contraband for failing to return the razorblade when asked.  They placed him in temporary administrative segregation on September 22 to await resolution of that charge.  Four days later, Finley attended his disciplinary hearing and argued that, because of his mental illness, he shouldn't be found guilty.  He also submitted a written statement elaborating on his mental illness and explaining that he couldn't control his behavior.  For her part, Salmi completed a sanction-assessment form to cast light on appropriate sanctions given Finley's mental illness.  She opined that Finley's mental illness hadn't affected his alleged misbehavior.  But she also warned that "[p]rolonged segregation

placement is likely to deteriorate his mental health status."[1]  Corr. Recs., R.88-6 at PageID 750. The hearing officer found Finley guilty and, as punishment, imposed several additional weeks without privileges.

**C.    Classification to Administrative Segregation**

The Security Classification Committee met the next day, September 27, to determine whether Finley should be housed in administrative segregation.  Huss led the proceeding, and two other prison officials—including Mark Hares, a mental-health professional—rounded out the three-person Committee.  Finley attended the meeting with a few hours' notice.  He argued that he needed mental-health treatment, not discipline.  He stressed the seriousness of his illnesses and noted that he was thinking about hurting himself.  The Committee reviewed Finley's disciplinary records, including the paperwork associated with his recent contraband-misconduct hearing.  And Huss personally reviewed Salmi's sanction assessment, where Salmi had warned that prolonged segregation would likely cause a deterioration in Finley's mental health.  Huss was also familiar with Finley's repeated self-mutilation over the prior four weeks.

Huss and the other Committee members nevertheless assigned Finley to administrative segregation.  Per MDOC policy, they filled out a "classification notice" form to formalize their decision.  The form cited Finley's recent contraband violation and reasoned that Finley had shown "an inability to be managed with general population privileges."  Corr. Recs., R-88-6 at PageID 754.  At her deposition, Huss explained that the Committee relied on Finley's history of misconduct and "his potential to honor the trust implicit in a lower level of security."  She added that administrative segregation "restricted access to a lot of the things that [Finley] was using to manipulate the process and harm himself."  Huss Dep., R.88-9 at PageID 817.

The Committee never discussed the possibility of placing Finley in mental-health treatment programs instead of administrative segregation.  Hares, the Committee's mental-health professional, made no medical recommendations.  He later explained that he didn't think he was

---

[1]This wasn't the first time Salmi issued such a warning.  She had included identical warnings in her sanction assessments for Finley's other misconduct hearings earlier that month.  She later explained at her deposition that the warning was a general statement that could ring true for anyone.

allowed to recommend alternatives to administrative segregation during the meeting unless he was aware of "acute" medical issues.**[2]** Hares Dep., R.88-8 at PageID 803, 805–06. He also clarified that he wasn't Finley's assigned clinician and didn't know the details of Finley's diagnoses or razor-swallowing behavior. The Committee thus seemingly defied—at least for summary-judgment purposes—MDOC rules that forbid classifying mentally ill inmates to administrative segregation without first consulting a mental-health professional about "whether the prisoner's mental health needs or limitations can be met in administrative segregation." Mich. Dep't of Corr., Policy Directive 04.05.120 ¶ N. Indeed, one section of the classification notice form—required "to be completed" before assigning a mentally ill inmate to segregation—included space for such a recommendation. Corr. Recs., R-88-6 at PageID 754. The Committee left that section blank.

## D.    October Reclassification

Within hours of his classification, Finley (confined in a temporary segregation cell) engaged in more self-harm. He overdosed on medication and swallowed half a razorblade. After a trip to the emergency room, Finley returned to suicide observation. He then took even more pills, cut himself, and swallowed another half razorblade. On September 30, medical officials airlifted Finley to the University of Michigan medical center for emergency surgery. Surgeons successfully removed all of the razors from Finley's body, including the razor that had been embedded in his throat for nearly a month.

On October 5, following his hospital discharge, Finley refused to approach his cell door to be restrained for transportation. That triggered another misconduct write-up—this time for disobeying a direct order. Finley told prison staff that he wanted to kill himself. After returning to the prison facility later that day, he received injections of antipsychotic drugs. The new medications proved helpful; they allowed Finley to better control his behavior and stop actively harming himself. He stayed in suicide observation for the next 19 days.

---

**[2]**When pressed at his deposition, Hares clarified that swallowing a razorblade constituted an "acute" problem. But despite repeated questioning, he never explained why Finley's situation didn't qualify as "acute." Instead, he suggested that he didn't know at the time whether Finley had even swallowed a razor.

During Finley's 19-day stint in observation, the Security Classification Committee met again to reconsider his placement in administrative segregation.[3] This time, Sarah Schroeder led the meeting—Schroeder would temporarily serve as deputy warden for the next few months while Huss was on sick leave. Like Huss, Schroeder knew about Finley's repeated self-mutilation, razor-swallowing, and hospitalizations. Still, the Committee never discussed alternatives to administrative segregation. The mental-health professional on the panel (not Finley's assigned clinician) declined to volunteer a medical recommendation, and Schroeder never asked for one. Following their October meeting, the Committee members issued a notice form "reclassifying" Finley to administrative segregation. They cited Finley's recent misconduct charge for disobeying a direct order (for which he'd been found guilty and punished with loss of privileges) and his "inability to be managed with general population privileges." Reclassification Notice, R.88-10 at PageID 831. The Committee didn't fill out the form's section on mental-health recommendations. And Finley wasn't invited to attend the meeting.

### E.     Time in Solitary Confinement

On October 25, prison officials moved Finley to his new cell in administrative segregation. Two days later, Salmi sent a concerned email to Schroeder and other officials. Salmi's email warned that Finley's "treatment needs cannot be met while in segregation placement." Emails, R.88-7 at PageID 795. She formally requested Finley's transfer to the Interim Care Program and cited an MDOC rule compelling swift action. That rule required Schroeder to release Finley from segregation within three business days if she concurred in Salmi's transfer recommendation. *See* Mich. Dep't of Corr., Policy Directive 04.06.182 ¶ I.[4] After consulting residential-unit staff, Schroeder promptly agreed with the recommendation to place Finley in the Interim Care Program. By October 31, Finley sat on the program's waitlist. But he remained in administrative segregation for the next two and a half months.

---

[3]Finley's misconduct charge for disobeying an order triggered this Committee meeting. But according to the deputy wardens, the meeting was scheduled in error. It was unnecessary, they claim, because Finley had already been classified to administrative segregation on September 27.

[4]The deputy wardens claim that this rule didn't apply to Finley's transfer. In their view, only certain mental-health treatment programs—not including the Interim Care Program—trigger the three-day requirement. They might be right, but nothing in the rule's text (or anything else in the record) supports such an interpretation. At the very least, Finley has established a triable issue about the rule's applicability.

Those months were difficult for Finley. With limited exceptions, he spent 24 hours per day alone in a windowless cell. Located on the prison's bottom floor, that "base-level" cell imposed unusually restrictive living conditions—even by administrative-segregation standards. The cell allowed virtually no natural light to reach its occupant. And unlike other solitary cells at the same facility, Finley's base-level cell was effectively sound-proofed by a layer of security glass. Nearby industrial fans further drowned out any outside noise. Thus, while inmates in administrative segregation usually can communicate with passing guards and neighboring inmates, Finley experienced near-total isolation. Other restrictions were more standard: He had very limited access to books and legal materials. He had no access to group activities or television. And he couldn't use the phone except for legal calls or emergencies.

Compounding that isolation, Finley also endured the loss-of-privileges sanctions assessed for his prior rule violations. Typically, inmates in administrative segregation get out-of-cell recreation five times per week. By contrast, Finley received out-of-cell time just eight times in the 79 days he spent in his base-level cell—though he turned down a few opportunities during frigid winter days. Most weeks, Finley's three allocated showers were the only times he left his cell.

Salmi visited Finley at least once per week. During those meetings, which typically took place in front of Finley's cell, Salmi asked Finley about how he was doing. She also ensured that Finley was taking his medications properly and wasn't having suicidal thoughts or violating prison rules. But those meetings were not therapeutic; therapy wasn't generally available in segregation. Salmi eventually formed the impression that Finley had control over his actions and that much of his conduct was for secondary gain. She noticed his behavior improve while in segregation, especially after he learned about his placement on the Interim Care Program waitlist: he took his medications as directed, stopped harming himself, and seemed calm and cooperative. Salmi later testified that prison officials had done the best they could to keep Finley safe.

Schroeder and other prison officials conducted regular reviews of Finley's placement in administrative segregation. These reviews occurred weekly through late November 2016 and monthly after that. Schroeder personally visited Finley's cell several times as part of the review

process, and Finley repeatedly asked her to be moved to the Interim Care Program. He also asked to be moved to a less restrictive cell so that he could communicate with other people. Each review culminated in a written form with input from several different officials: housing staff provided written evaluations of Finley's behavior, and representatives of the Security Classification Committee (nearly always Schroeder and the resident unit manager) made a recommendation about whether Finley should remain in segregation. Schroeder consistently recommended continued segregation. She always cited Finley's earlier contraband misconduct for failing to return a razorblade and, in most of the forms, noted that Finley was waiting for a spot in the Interim Care Program. Over the same time, Schroeder met weekly with mental-health professionals and housing staff to discuss the Interim Care Program's waitlist. They sometimes adjusted the list's order, making priority judgments based on the inmates' good behavior and mental-health status.

Finley left administrative segregation and entered the Interim Care Program on January 11, 2017. About fifteen weeks had passed since his September 27 classification; Finley spent eleven of those weeks in the base-level cell.[5] While in segregation, Finley experienced insomnia, anxiety, and decompensation. He couldn't sleep more than two or three hours per night, and he rapidly lost weight. The stint in solitary confinement worsened his concentration and aggravated his depression and tachycardia. A psychiatrist would later diagnose Finley with sub-syndromal PTSD arising from the endeavor. That psychiatrist also opined, among other things, that the stressful events worsened Finley's bipolar disorder and long-term medical prognosis.

**F.    Procedural History**

While he was still confined in administrative segregation, Finley filed a pro se action in federal district court. He alleged that Huss's decision to place him in solitary confinement—and Schroeder's decision to keep him there—violated the Eighth Amendment and his Fourteenth

---

[5]In the deputy wardens' view, the eleven-week figure is the proper measure of Finley's tenure in administrative segregation. But apart from about a week in the hospital, prison officials continually kept Finley in various forms of highly restricted solitary conditions—whether labeled "administrative segregation" or "suicide observation"—ever since his September 27 classification to administrative segregation. The most appropriate start-date is thus a triable issue of fact.

Amendment procedural due process rights.   He also brought disability-discrimination claims under the Americans with Disabilities Act and the Rehabilitation Act.   The district court dismissed the case for failure to state a claim, prompting an appeal.   We reversed and allowed Finley to proceed on his claims.  *Finley v. Huss*, 723 F. App'x 294 (6th Cir. 2018).

On remand, Finley voluntarily dismissed his prior suit and filed a new action alleging the same constitutional and statutory violations.  To help support those claims, he retained two experts: a psychiatrist specializing in correctional mental health and a penology expert experienced in prison operations.   But after discovery, the district court granted Huss and Schroeder's motion for summary judgment.  It reasoned that both defendants were entitled to qualified immunity against Finley's constitutional claims, and it rejected Finley's statutory discrimination claims.  Now, Finley appeals once again.

## II.  STANDARD OF REVIEW

We review the district court's decision to grant summary judgment de novo. *Helphenstine v. Lewis County*, 60 F.4th 305, 314 (6th Cir. 2023).  Summary judgment is proper whenever no genuine disputes of material fact exist and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Because Finley was the non-moving party below, we must draw any justifiable inferences in his favor.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## III.  EIGHTH AMENDMENT

Finley first alleges that Huss and Schroeder violated his Eighth Amendment rights.  He argues that, by placing him in administrative segregation and keeping him there for months, the deputy wardens were deliberately indifferent to the substantial risks that solitary confinement posed to his mental health.

In their defense, Huss and Schroeder raised the doctrine of qualified immunity.  Where applicable, qualified immunity shields government officials from lawsuits for civil damages. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).  It applies when an official's conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would

have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). That standard implicates two questions: (1) Did the officials violate a right? (2) If so, was the right clearly established at the time of the challenged conduct? *Ortega v. U.S. Immigr. & Customs Enf't*, 737 F.3d 435, 438 (6th Cir. 2013). If the answer to either question is "no," then the official is entitled to qualified immunity. *al-Kidd*, 563 U.S. at 735. We can tackle these questions in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Finley clears both hurdles.

## A.      Eighth Amendment Violation

The Eighth Amendment prohibits "cruel and unusual punishments." U.S. Const. amend. VIII. The Supreme Court has held that a prison official's deliberate indifference to conditions that pose a substantial risk to an inmate's health and safety violates the Eighth Amendment. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). To determine whether an official was deliberately indifferent to such conditions of confinement, we employ a two-pronged analysis with both an objective and a subjective component. *Wilson v. Williams*, 961 F.3d 829, 839 (6th Cir. 2020). The objective prong asks whether the inmate was incarcerated under conditions posing a substantial risk of serious harm. *Farmer*, 511 U.S. at 834. The subjective prong then asks whether officials knew of and disregarded that excessive risk to the inmate's health or safety. *Id.* at 837.[6]

### 1.      Objective Prong

Finley satisfies the objective prong. Plenty of record evidence illuminates the substantial risk that administrative segregation would dangerously aggravate Finley's mental health.

---

[6]The district court aptly noted that Finley's deliberate-indifference claim could proceed under two theories: (1) indifference to unsafe conditions of confinement, and (2) indifference to a serious medical need. Finley's appellate briefing focuses on the conditions of confinement, arguing that Huss and Schroeder were deliberately indifferent to a substantial risk to his future health and safety when they placed him in prolonged segregated conditions. He subsumes his discussion of serious medical needs into that conditions-of-confinement analysis. We follow Finley's lead. In any event, the distinction doesn't ultimately matter. Whether an inmate characterizes his purportedly unlawful treatment "as inhuman conditions of confinement, failure to attend to his medical needs, or a combination of both," the same two-pronged deliberate-indifference inquiry applies. *Helling v. McKinney*, 509 U.S. 25, 32 (1993) (citation omitted). The same facts advance both overlapping theories here. *Cf. Palakovic v. Wetzel*, 854 F.3d 209, 225–29 (3d Cir. 2017) (explaining that inmate's fragile mental health and history of self-harm—combined with officials' decision to place him in solitary confinement—sufficed to show deliberate indifference under both theories).

After all, no one disputes that Finley had a severe mental illness and committed self-harm in segregated conditions. Consider Finley's behavior in the weeks preceding the Huss-led September 27 classification hearing: He cut himself repeatedly, wrote on the walls with his own blood, and swallowed multiple razorblades—all while in suicide observation or other heavily restricted solitary conditions. Indeed, temporary administrative segregation triggered a bout of Finley's self-harm on September 8. And temporary segregation triggered even more self-harm in late September—shortly after the Huss-led hearing but before the Schroeder-led reclassification meeting—when Finley overdosed on medication and swallowed yet another razor. Moreover, Salmi wrote in multiple documents that prolonged segregation was likely to worsen Finley's mental health. At bottom, a reasonable jury could conclude that placing Finley in administrative segregation posed a substantial risk to his safety.

### 2.     Subjective Prong

Next comes the subjective prong. Under this inquiry, Finley must prove that the deputy wardens (1) knew about facts from which they could infer that a substantial risk existed, (2) drew that inference, and (3) disregarded the risk. *See Buetenmiller v. Macomb Cnty. Jail*, 53 F.4th 939, 944 (6th Cir. 2022). Finley has established triable issues of fact for all three requirements.

Reasonable jurors could find that Huss and Schroeder knew enough to infer that segregated conditions posed a substantial risk to Finley. First, both officials confirmed in their depositions that they knew about Finley's self-harming behavior before classifying him to administrative segregation. The record also contains emails from prison staff alerting Huss and Schroeder to Finley's various razor-swallowing incidents and hospital trips. And Finley told Huss during the September 27 classification hearing that he was thinking about hurting himself. Perhaps most importantly, Salmi's warnings reinforce both officials' subjective awareness: Shortly before classifying Finley to administrative segregation, Huss personally reviewed Salmi's written warning that prolonged segregation would likely cause Finley's mental health to deteriorate.**[7]** And two days after Schroeder reclassified Finley to administrative

---

**[7]**Of course, the jury would also consider Salmi's after-the-fact statements about Finley's improved behavior in administrative segregation and her retrospective opinion that prison officials did the best they could. If credited, such facts could justify a finding for Huss and Schroeder.

segregation, Salmi sent her an email explaining that Finley's mental-health needs couldn't be met while in administrative segregation and formally requesting his transfer to a mental-health program. These facts could prompt the inference that administrative segregation posed a risk to Finley.

Similarly, reasonable jurors could conclude that Huss and Schroeder drew that inference. Let's start with Huss. She visited Finley in his suicide-observation cell about two weeks before classifying him to administrative segregation and, according to Finley's deposition testimony, acknowledged that he couldn't stand segregation due to his mental health. Turning to Schroeder, emails in the record show that she promptly agreed with Salmi's recommendation to transfer Finley to a mental-health program. Combined with the deputy wardens' above-described knowledge, this evidence creates a triable issue about whether they had inferred that administrative segregation would risk seriously worsening Finley's mental illness.[8]

That brings us to the trickiest question: whether Huss and Schroeder disregarded the risk. Evidence in the record goes both ways.

On the one hand, Huss and Schroeder present evidence that they thought they had responded to the risk. For example, one rationale that Huss cites for moving Finley to administrative segregation was her belief that segregation might help prevent Finley from accessing objects that he could use to hurt himself.[9] Prison officials also provided Finley

---

[8]Resisting this conclusion, Huss and Schroeder note that mental-health professionals present at both security classification meetings never raised any objections or concerns related to Finley's placement in segregation. However, that argument cannot justify summary judgment. As Finley correctly observes, evidence in the record suggests that mental-health professionals were not allowed—or at least did not think they were allowed—to raise such objections at classification meetings. The record further supports an inference that mental-health professionals at the classification meetings lacked the requisite information—including knowledge of Finley's diagnoses and razor-swallowing behavior—to make such medical judgments. That substantially limits the probative value of their silence.

[9]Relatedly, Judge Thapar suggests that the deputy wardens lacked viable alternatives to segregation. *See infra* at 47–48 (Thapar, J, dissenting in part). First, he accurately observes that the deputy wardens couldn't safely house Finley with other inmates in the general population. He then posits that mental-health treatment programs weren't options, either. *See id.* We don't think the record supports the latter conclusion. True, Salmi rejected Finley's initial request for placement in one particular treatment setting—the intensive Residential Treatment Program. But that happened on September 6, several weeks before Finley's assignment to administrative segregation. During those weeks, Finley's self-harm continued and seemingly escalated. Plus, other treatment programs existed; Salmi herself later recommended the Interim Care Program. Triable issues remain on the alternatives to segregation available to Huss and Schroeder.

antipsychotic drugs to manage his mental illness. In fact, the drugs that Finley started taking in early October proved somewhat successful; they enabled him to stop actively hurting himself.**[10]** And Schroeder recommended Finley to a treatment program, placing him on the waitlist until an opening in the program arose. If credited, such evidence might allow a jury to find that Huss and Schroeder are not liable. *See Farmer*, 511 U.S. at 844.

On the other hand, Finley presents evidence that the deputy wardens disregarded the risk. Neither Huss nor Schroeder considered alternatives to administrative segregation during the classification meetings, and they left the mental-health portion of the hearing forms blank. In so doing, they likely violated MDOC rules designed to protect mentally ill inmates from harm, creating a suspicion of deliberate indifference. *Harris v. City of Circleville*, 583 F.3d 356, 369 (6th Cir. 2009) (emphasizing officials' failure to comply with jail policy); *see also Comstock v. McCrary*, 273 F.3d 693, 706–07, 709 (6th Cir. 2001) (noting that a prison official's violations of MDOC policies—including his failure to properly fill out required forms—helped demonstrate his deliberate indifference). On the same note, Schroeder did not transfer Finley out of administrative segregation within the three-day window that MDOC policy seemingly required. Rather, she regularly reviewed Finley's placement—visiting his base-level cell that provided virtually no human interaction or natural light, and which he rarely left—and endorsed sustained isolation for over two additional months. Schroeder also apparently rejected Finley's request that she mitigate the harshness of his living conditions, such as by moving him to a less isolating cell in segregated housing.

In sum, this conflicting evidence creates work for a jury. The deputy wardens fail to meet their summary-judgment burden. Although their evidence undercuts the notion that they knew with certainty that placing Finley in administrative segregation would result in harm, that is not the deliberate-indifference standard. *See Farmer*, 511 U.S. at 836 (noting that "knowing" conduct is unnecessary to satisfy the deliberate-indifference mental state). Rather, Finley needs

---

**[10]** Huss and Schroeder argue that this necessarily bars Finley's deliberate-indifference claim. But even though Finley stopped actively harming himself, his mental health still deteriorated in segregation—just as Salmi had predicted. *See Finley*, 723 F. App'x at 298–99 (noting that when prison medical professionals warn that solitary confinement will exacerbate a mental-health disorder, "claiming that medication makes it permissible is a little like bandaging a person's broken leg but then taking away his crutches").

proof only that Huss and Schroeder knew of a substantial risk that harm would result—or, in Salmi's words, "likely" to result—and that they recklessly exposed him to it anyway.  *Id.* at 836–37.  Under that threshold, reasonable jurors could find for Finley.

**B.      Clearly Established Law**

Proving an Eighth Amendment violation isn't enough to defeat qualified immunity. Finley must also show that the law "clearly established" the unconstitutionality of Huss and Schroeder's challenged conduct.  *Harlow*, 457 U.S. at 818.  Existing law must place an official's conduct "beyond debate" such that any reasonable official would understand that her conduct was unlawful.  *al-Kidd*, 563 U.S. at 741.  This inquiry "protects 'all but the plainly incompetent or those who knowingly violate the law.'"  *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  A question is beyond debate when then-existing precedent prohibits the challenged conduct, *al-Kidd*, 563 U.S. at 741, or when the conduct is so egregious that any reasonable official would realize that it violates the Constitution, *Taylor v. Riojas*, 592 U.S. 7, 9 (2020).

Although it is a close call, Finley can defeat qualified immunity with existing precedent. Existing precedent clearly establishes a violation when controlling authority—that is, a Supreme Court decision, published Sixth Circuit decision, or here, a Western District of Michigan decision—bars the official's conduct.  *See Ortega*, 737 F.3d at 439–40.  It can also establish a violation when an on-point and "robust consensus of cases of persuasive authority" places the violation beyond debate.  *Id*.  Such authority cannot just suggest that the officials' conduct was unlawful.  *Wesby*, 583 U.S. at 63. Rather, it must make apparent that the conduct was unlawful under the circumstances.  *Id.*

The critical threshold step is defining the right at issue.  The Supreme Court has repeatedly commanded inferior courts not to define rights at too high a level of generality.  *See, e.g.*, *White v. Pauly,* 580 U.S. 73, 79 (2017); *al-Kidd*, 563 U.S. at 742.  A right must be defined with enough specificity to address "whether the official acted reasonably in the particular circumstances that he or she faced."  *Wesby*, 583 U.S. at 63–64.  Thus, general propositions of law usually aren't enough to clearly establish a right.  *White,* 580 U.S. at 79–80.  That said,

Finley need not point to a case "on all fours" with the instant fact pattern. *Vanderhoef v. Dixon*, 938 F.3d 271, 278 (6th Cir. 2019) (quoting *Hopper v. Plummer*, 887 F.3d 744, 755 (6th Cir. 2018)). Cases must only be sufficiently analogous to ensure that a "reasonable official would understand" that she is violating the right in question. *Anderson*, 483 U.S. at 640.

Against that backdrop, we frame the inquiry as follows: Did the law clearly establish in 2016 that an official violates the Eighth Amendment by subjecting an inmate with known psychiatric disorders and a history of self-harm to conditions that, due to a medical professional's warning, the official knows poses a substantial risk of dangerously aggravating the inmate's psychiatric health? That articulation isn't too general. *See Rhodes v. Michigan*, 10 F.4th 665, 680 (6th Cir. 2021). Indeed, this Court routinely uses far broader articulations of clearly established principles in other deliberate-indifference cases. *See, e.g.*, *Bays v. Montmorency County*, 874 F.3d 264, 270 (6th Cir. 2017) (the "right to have a serious psychological illness treated seriously"); *Clark-Murphy v. Foreback*, 439 F.3d 280, 292 (6th Cir. 2006) (the "right to psychological treatment"); *Comstock*, 273 F.3d at 711 (the "right to medical attention once the prisoner's suicidal tendencies are known"); *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (en banc) (the inmate's "right not to have his serious medical needs treated with deliberate indifference"). At the same time, the articulation does not unreasonably narrow the right by focusing on specific features of the confinement. *See Rhodes*, 10 F.4th at 680.

We adopted a similar approach in *Linden v. Washtenaw County*, 167 F. App'x 410 (6th Cir. 2006), a case with somewhat analogous facts. There, jail officials placed a mentally ill inmate on suicide watch and provided him psychiatric drugs. A psychiatrist eventually deemed it safe to remove the inmate from suicide watch. Pursuant to jail policy, officials placed the inmate in the medical unit for a brief transition period. *Id.* at 414, 423–24. But, in an attempt to stop a reported fight, a classification officer transferred the inmate to an isolation cell. The classification officer knew about the inmate's mental illness and history of suicide attempts. He "understood that placing [the inmate] in isolation aggravated" the inmate's suicidal tendencies. Indeed, a mental-health professional had warned the officer that the inmate "doesn't do very well when he's isolated." *Id.* at 423–25. The inmate committed suicide in the isolation cell. In denying the classification officer qualified immunity, we rejected his argument that the defined

right needed to include the "specific act of moving [the inmate] to an isolation cell." *Id.* at 425. The clearly established right was the inmate's broader right to effective suicide-prevention measures; focusing on the isolation cell itself wasn't warranted. *Id.*  The same is true here.

Finley recommends a different route.  He argues that we should effectively skip the "clearly established" inquiry altogether because he has already shown that Huss and Schroeder subjectively knew about and disregarded risks to his psychiatric health.  In other words, he invites us to collapse qualified immunity's two prongs into one whenever the plaintiff can prove—as he must in any successful deliberate-indifference case—that the defendant deliberately disregarded a known danger.  After all, "qualified immunity does not protect 'those who knowingly violate the law.'"  Reply Br. 17 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  Finley's approach isn't without support.  Several of our sister circuits have endorsed it. *See, e.g.*, *Delgado-Brunet v. Clark*, 93 F.3d 339, 346 (7th Cir. 1996); *Thorpe v. Clarke*, 37 F.4th 926, 934 (4th Cir. 2022); *Beers-Capitol v. Whetzel*, 256 F.3d 120, 142 n.15 (3d Cir. 2001). Even this Court has agreed with it, albeit in an unpublished opinion.  *McKee v. Turner*, 124 F.3d 198 (6th Cir. 1997) (unpublished table decision) ("A finding of deliberate indifference necessarily precludes a finding of qualified immunity." (citation omitted)).  Indeed, we are aware of very few Sixth Circuit cases where we have held that a plaintiff satisfied the deliberate-indifference standard but granted qualified immunity on "clearly established" grounds.

However, Finley's argument goes too far.  It does not automatically follow that someone who knowingly disregards a serious risk also knowingly disregards the Constitution.  Some risks, after all, are not objectively serious enough to implicate constitutional protections.  And overarching legal standards—like *Farmer v. Brennan*'s rule against exposing inmates to "a substantial risk of serious harm"—don't provide much clarification.  511 U.S. at 834.  An official could thus knowingly expose an inmate to a serious risk without realizing that the risk triggered the Eighth Amendment.  *See Est. of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1049–50 (9th Cir. 2002).  Such an official is grossly irresponsible but not necessarily a knowing lawbreaker.  Thus, the "clearly established" analysis retains some teeth in deliberate-indifference cases. *Beck v. Hamblen County*, 969 F.3d 592, 600–04 (6th Cir. 2020).  Indeed, we have used it to grant qualified immunity in cases where reasonable officials might not realize the significance

of the risks at stake. *See Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 992–94 (6th Cir. 2017) (granting qualified immunity to jail officials because the inmate's medical condition and deprivation fell "well short" of those in prior cases and "there was nothing to suggest" that the inmate was even at risk of the heart attack that killed him); *Perez v. Oakland County*, 466 F.3d 416, 426–30 (6th Cir. 2006) (granting qualified immunity because caselaw did not clearly establish that inmates enjoy a right to accurate suicide-risk assessments or effective suicide-monitoring arrangements).

That said, deliberate indifference's subjective-culpability requirement arguably plays a role in choosing the appropriate level of generality for a given right. It justifies somewhat less granular principles than, say, Fourth Amendment cases involving split-second decisions where officials genuinely—but perhaps mistakenly—believe their actions to be appropriate. Relatively broad yet deep-rooted rights, such as the right to psychiatric care, are enough to place already culpable officials on notice that their actions were not only wrong but also unlawful. *See Linden*, 167 F. App'x at 424–25; *see also, e.g.*, *Bays*, 874 F.3d at 270. In other words, the "clearly established" analysis protects deliberately indifferent officials from liability for violating general legal standards unexpectedly transposed to new contexts. To illustrate, take our recent decision in *Rhodes v. Michigan*. 10 F.4th at 679–83. There, we found that prison officials were deliberately indifferent to an inmate's safety by subjecting her to dangerous work conditions at her prison job. *Id.* at 773–74. We then confined our "clearly established" inquiry to whether the law had clearly established that *Farmer*'s general conditions-of-confinement protections extended to the prison workplace. *Id.* at 679–80. A "yes" answer sufficed to deny qualified immunity. *Id.* at 683.

Having defined the right, we turn to the cases.

By 2016, Sixth Circuit caselaw had clearly established the principle that officials violate the Constitution by failing to take basic steps to address mentally ill inmates' known psychiatric needs. Consider *Comstock v. McCrary*, 273 F.3d 693 (6th Cir. 2001), and *Clark-Murphy v. Foreback*, 439 F.3d 280 (6th Cir. 2006).

*Comstock* involved officials' failure to protect a suicidal inmate. 273 F.3d at 699–700. A prison psychologist evaluated the inmate, concluded that he was at risk of suicide, and placed him on suicide watch. The next day, the psychologist visited the inmate and reevaluated him. The inmate claimed that he wasn't suicidal, and the psychologist took him at his word. Without further investigation, the psychologist recommended the inmate's transfer to his old cell in administrative segregation. The inmate later killed himself in administrative segregation. *Id.* Among other things, the psychologist had breached mandatory prison policies designed to prevent suicide. *Id.* at 706–07. We reasoned that the psychologist was deliberately indifferent by taking "grossly inadequate" steps to address the known risk that the inmate "would harm himself when presented with the opportunity." *Id.* at 711.

A few years later, we decided *Clark-Murphy*. There, an inmate suffered a psychotic episode. 439 F.3d at 285. Recognizing that, prison officials promptly placed him in an observation cell. For the next four days, various guards, medical personnel, and other officials observed the inmate engaging in bizarre conduct—including "barking like a dog," "pacing back and forth naked," and urinating on the floor—which led them to believe that he required psychological or psychiatric intervention. *Id.* at 283–85. The water for his cell was turned off for at least some of that time, and the inmate ultimately died of dehydration. *Id.* His estate brought Eighth Amendment claims alleging both a denial of water and a denial of psychological services. *Id.* at 285, 285–87. Regarding psychological services, we found triable factual issues for several defendants. Most notably, the deputy warden could be deliberately indifferent because a mental-health professional had emailed him a warning that the inmate was psychotic and that his "current level of functioning requires intense interventions." *Id.* at 287–88. In addition, one of the other officials could be deliberately indifferent because he took no steps to address the inmate's psychiatric needs beyond filling out a healthcare referral form. *Id.* at 283, 288.

*Comstock* and *Clark-Murphy* both show that prison officials violate the Constitution by failing to take appropriate action to protect inmates under their care who suffer from known severe psychiatric disorders. Granted, these cases are hardly on all fours with Finley's situation. Among other things, Finley received more treatment—though the officials in *Comstock* and

*Clark-Murphy* did take some steps such as performing medical evaluations and making referrals. The cases also don't address the specific harms of solitary confinement. And most significantly, *Comstock* and *Clark-Murphy* involved failures to take affirmative steps to treat psychiatric disorders; they don't spell out the rule that it is *also* unconstitutional to take steps known to risk worsening psychiatric disorders. But they nonetheless suffice to put Huss and Schroeder on notice that their actions violated Finley's rights.

The first reason is fairly intuitive. Any reasonable person would know that if it is unconstitutional to fail to step in and address known risks, it is also unconstitutional to affirmatively and knowingly worsen those risks. To illustrate, compare Finley's case with *Bays v. Montmorency County*, 874 F.3d 264 (6th Cir. 2017). We previously noted that "the facts in *Bays* were not nearly [as] problematic" as the ones in Finley's case. *Finley*, 723 F. App'x at 298. In *Bays*, an inmate with a known history of self-harm and suicidal behavior was placed in the general population. The jail nurse took some steps to provide mental-health care, including screening him for suicidality, scheduling a medical appointment to meet with him, and even trying to move up the scheduled meeting. Unfortunately, the inmate still committed suicide. *Bays*, 874 F.3d at 267. The Court found triable issues on whether the nurse was deliberately indifferent. It also denied her qualified immunity because the inmate's "right to have a serious psychological illness treated seriously" was "clearly established." *Id.* at 270. To suggest that the nurse in *Bays* was on notice that failing to help the inmate would violate the Constitution—but the deputy wardens here weren't expected to understand that knowingly worsening Finley's condition violated his rights—strikes us as inconsistent.

Indeed, it is hardly a novel proposition that the Eighth Amendment extends to affirmative acts that endanger inmates. In fact, a robust consensus of persuasive authorities showed even in 2016 that officials commit cruel and unusual punishment by subjecting inmates to particularly egregious forms of solitary confinement. *See, e.g.*, *Keenan v. Hall*, 83 F.3d 1083, 1089–91 (9th Cir. 1996); *Walker v. Shansky*, 28 F.3d 666, 672–73 (7th Cir. 1994); *Gates v. Collier*, 501 F.2d 1291, 1304 (5th Cir. 1974); *LaReau v. MacDougall*, 473 F.2d 974, 977–78 (2d Cir. 1972). Granted, none of those cases reached the special risks of solitary confinement to those with

mental illnesses.**11**  But the point is that reasonable officials shouldn't be caught off guard that *Comstock* and *Clark-Murphy*'s principles apply even in the context of placing mentally ill inmates in dangerous forms of solitary confinement.  Huss and Schroeder are not entitled to qualified immunity against Finley's Eighth Amendment claim.**12**

## IV.  PROCEDURAL DUE PROCESS

Finley next brings a procedural due process claim.  He argues that the deputy wardens deprived him of due process when they assigned him to administrative segregation and kept him there for approximately three months.  As with Finley's Eighth Amendment claim, Huss and Schroeder raised qualified immunity as a defense.  But unlike the Eighth Amendment claim, we need not reach the "clearly established" inquiry—the deputy wardens are entitled to qualified immunity because Finley cannot show a due process violation at all.

The Fourteenth Amendment's Due Process Clause constrains governmental decisions that deprive individuals of certain protected interests.  *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).  A procedural due process claim involves two steps.  The plaintiff must first demonstrate the presence of a constitutionally protected "property" or "liberty" interest.  Then, the plaintiff must show that a state actor deprived him of that interest without affording him constitutionally sufficient process.  *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 459–60 (1989).  Here, Finley's claim proceeds on the theory that Huss and Schroeder unlawfully deprived him of a protected liberty interest by subjecting him to administrative segregation without following the requisite procedures.

---

**11**Finley cites recent decisions from our sister circuits holding that mentally ill inmates have a constitutional right against placement in solitary confinement when officials know that such confinement is likely to dangerously worsen the inmates' mental health.  *Clark v. Coupe*, 55 F.4th 167, 179–81 (3d Cir. 2022); *Palakovic v. Wetzel*, 854 F.3d 209, 225–29 (3d Cir. 2017); *see Porter v. Clarke*, 923 F.3d 348, 355–64 (4th Cir. 2019) (holding that long-term solitary confinement might violate the Eighth Amendment when it imposes a "'substantial risk' of serious psychological and emotional harm").  But because those opinions were issued after 2016, they cannot clearly establish the law for this case.

**12**Judge Thapar raises a concern that our decision could make prison officials' difficult jobs even harder. *See infra* at 51 (Thapar, J., dissenting in part).  After all, a significant percentage of incarcerated people have mental illnesses. *See id.* at 51 n.1.  To be clear, nothing in this opinion says that mentally ill inmates have a per se right— much less a clearly established right—to avoid placement in segregated housing.  Several case-specific factors shape our holding, especially Finley's repeated self-harm and his mental-health professional's warning that prolonged segregation would likely worsen his condition.

A.      **Protected Liberty Interest**

The threshold issue is whether Finley had a protected liberty interest.   Generally speaking, inmates lack protected liberty interests in avoiding administrative segregation. *Rimmer-Bey v. Brown*, 62 F.3d 789, 791 (6th Cir. 1995).   However, administrative segregation can still implicate a liberty interest when it "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995); *see Harden-Bey v. Rutter*, 524 F.3d 789, 792–95 (6th Cir. 2008) (holding that inmate's three-year confinement in administrative segregation could constitute such "atypical and significant hardship").   In approaching that inquiry, courts consider both the duration and nature of the more-restrictive confinement.  *Harden-Bey*, 524 F.3d at 793; *see Wilkinson v. Austin*, 545 U.S. 209, 223–24 (2005).   In this case, Finley's conditions met that standard.

To be sure, Finley's three months in administrative segregation—without more—cannot implicate a liberty interest.   His tenure in segregated housing falls comfortably within the duration that we've deemed part of the ordinary incidents of prison life.  *See Mackey v. Dyke*, 111 F.3d 460, 461 (6th Cir. 1997) (holding that nearly four months' delay in returning inmate from solitary confinement didn't implicate a liberty interest); *McMann v. Gundy*, 39 F. App'x 208, 210 (6th Cir. 2002) (five months in solitary); *Powell v. Washington*, 720 F. App'x 222, 226 (6th Cir. 2017) (six months).   And the unusually restrictive conditions that Finley experienced in his base-level cell, though certainly relevant, probably aren't enough to change that outcome. The Supreme Court described similarly isolating conditions in *Wilkinson*, a case where it ultimately concluded that inmates enjoy protected liberty interests in avoiding classification to certain ultra-restrictive facilities.  *See* 545 U.S. at 223–24.   But those isolating conditions didn't satisfy the requisite hardship until viewed in combination with other factors. *Id.*

That doesn't end the issue.   Rather, Finley urges us to consider one additional factor: his severe psychiatric disorders.   He argues that the months he spent in an unusually restrictive solitary cell—combined with his mental illness—imposed an atypical and significant hardship on him.  Huss and Schroeder disagree.   They don't dispute that Finley's mental illness increased his vulnerability to the harms of solitary confinement.   But, relying on our decision in *Austin v. Wilkinson*, they argue that such individual vulnerabilities don't matter.  *See* 372 F.3d 346 (6th

Cir. 2004), *aff'd in relevant part*, 545 U.S. 209 (2005). In their view, *Austin* precludes us from considering disabilities that render inmates uniquely vulnerable to conditions that wouldn't otherwise implicate a liberty interest.

We disagree with the deputy wardens' reading of *Austin*. In that case, we considered the appropriate "baseline" standard (i.e., the "ordinary incidents of prison life") against which a challenged form of confinement should be compared. The prison-official defendants had recommended using other states' supermax facilities—the harshest prisons around the country—to set that baseline. *Id.* at 353–54. *Austin* firmly disagreed. "Whatever the 'ordinary incidents of prison life' may encompass," the opinion reasoned, "they must be decided with reference to the particular prison system at issue, and can only be truly 'ordinary' when experienced by a significant proportion of the prison population." *Id.* at 355.

Nothing in *Austin*'s "baseline" discussion requires courts to disregard inmate-specific factors while gauging the atypicality or significance of a given inmate's hardship. *Austin* made a rather straightforward observation: the "ordinary incidents of prison life" captures conditions experienced by a relatively broad swath of inmates. *See id.* But when turning to a specific inmate's confinement in any given case, courts don't look for what is "ordinary." Quite the opposite—they search for deviations from "ordinary" by comparing the inmate's actually experienced conditions to the generally applicable baseline. *See Sandin*, 515 U.S. at 484. Factoring in inmate-specific vulnerabilities is consistent with *Austin*. And no other Sixth Circuit precedent meaningfully addresses this issue.

Helpfully, other circuits have already weighed in. And every court to reach the issue has endorsed the consideration of inmate-specific vulnerabilities. The Seventh Circuit, for example, held that a mentally ill inmate had a protected liberty interest against certain highly restrictive solitary conditions. *Townsend v. Cooper*, 759 F.3d 678 (7th Cir. 2014). Those harsh conditions, combined with their impact on the inmate's already serious mental illness, "easily me[t]" the atypical-and-significant-hardship standard. *Id.* at 686. The Ninth and Second Circuits reached similar conclusions for inmates with physical disabilities. *See Serrano v. Francis*, 345 F.3d 1071, 1079 (9th Cir. 2003) (holding that administrative segregation, combined with a wheelchair-bound inmate's disability, imposed an atypical and significant hardship on that

inmate); *Wheeler v. Butler*, 209 F. App'x 14, 16 (2d Cir. 2006) (holding that depriving a hearing-impaired inmate of his hearing aids in administrative segregation could constitute an atypical and significant hardship because the severity of the inmate's medical needs "may bear upon the atypicality of his punishment").

Moreover, as the Tenth Circuit has described, consideration of inmate-specific characteristics can sometimes even play to the advantage of prison officials. In *Estate of DiMarco v. Wyoming Department of Corrections*, prison officials faced the challenge of incarcerating a person who outwardly presented as a woman but had male sex characteristics. 473 F.3d 1334, 1336 (10th Cir. 2007). They placed her in an all-women's facility but—after learning about her situation—deemed it appropriate to assign her to administrative segregation. *Id.* In deciding whether the inmate's indefinite confinement in administrative segregation implicated a liberty interest, Judge Tymkovich's opinion carefully considered the inmate's unusual personal characteristics. It credited the prison officials' explanation (which the inmate herself conceded was true) that segregation was necessary to keep both the inmate and the general prison population safe. And it acknowledged that no plausible alternatives to segregation existed at the time. After weighing those and several other factors, the court ultimately concluded that administrative segregation hadn't imposed an atypical and significant hardship on the inmate. *Id.* at 1342–43.

This Court's own substantive due process jurisprudence, though not directly applicable, further reinforces the relevance of inmate-specific characteristics. *See J.H. v. Williamson County*, 951 F.3d 709 (6th Cir. 2020). In *J.H.*, we held that officials at a juvenile detention center had violated a pretrial detainee's Fourteenth Amendment due process rights by placing him in solitary confinement. In reaching that holding, we considered vulnerabilities specific to the detainee that made his placement in segregation "particularly harsh." *Id.* at 718. We noted the duration and nature of his confinement, as well as the detainee's young age. And most relevant here, we emphasized the detainee's severe psychiatric problems and the growing national consensus that solitary confinement can cause extraordinary harm. We reasoned that the detainee's "documented mental health issues made him particularly vulnerable to the effects of solitary confinement." *Id.* at 719.

In sum, we see no reason to create a circuit split on this issue. Considering an inmate's personal characteristics when determining the presence of an atypical and significant hardship seems both appropriate and intuitive. A paraplegic forced to drag himself around a wheelchair-inaccessible cell surely experiences an atypical and significant hardship, regardless of the comparatively tame experiences of able-bodied people confined in similar cells. *Serrano*, 345 F.3d at 1079. By the same token, extended stints in solitary confinement might be ordinary incidents of prison life for most inmates—but they impose an entirely different level of hardship on inmates with severe psychiatric disorders. *See Townsend*, 759 F.3d at 686; *J.H.*, 951 F.3d at 719.

Applying that standard to Finley's case is straightforward. Huss subjected Finley to indefinite administrative segregation that, under Schroeder, ultimately endured for around three months. The conditions that Finley experienced in his base-level cell were unusually restrictive, even when compared to other forms of administrative segregation at the same high-security prison: He was deprived of almost all human interaction. He had almost zero natural light. And he rarely left his cell. Finally, and most significantly, Finley has severe psychiatric disorders that render him particularly vulnerable to solitary confinement's destructive force. Indeed, those disorders had already prompted repeated instances of self-mutilation—mostly in solitary conditions. Standing alone, any one of these factors might fall short of creating a liberty interest. *See Wilkinson*, 545 U.S. at 224. But "taken together" they amount to an atypical and significant hardship, meaning that Finley possessed a liberty interest against his stay in solitary confinement under the unique facts of this case. *See id.*

## B.    Adequacy of Procedures

The next step is determining whether the deputy wardens deprived Finley of that protected liberty interest without affording him due process. The procedural requirements of due process are highly situation dependent. *Wilkinson*, 545 U.S. at 224. When analyzing the sufficiency of procedures for any given situation, courts employ a flexible framework. We balance (1) the private interest at stake, (2) the risk of an erroneous deprivation and the likely value of extra safeguards, and (3) the government's interests, including the fiscal or

administrative burdens of implementing more stringent procedures.  *Mathews*, 424 U.S. at 334–35.

In the correctional context, the Supreme Court instructs us to afford officials particular deference and flexibility.  *Hewitt v. Helms*, 459 U.S. 460, 472 (1983), *overruled on other grounds by Sandin*, 515 U.S. at 480–84.  After all, prison administration is "an extraordinarily difficult undertaking," and prison officials bear significant responsibility for the safety and security of everyone inside their institutions.  *Wolff v. McDonnell*, 418 U.S. 539, 566–67 (1974).  Elaborate procedural processes can be impractical or dangerous, underscoring the government's hefty interest in streamlined procedures.  *Id.* at 562–63, 567; *see Wilkinson*, 545 U.S. at 227–28 (citing *Mathews*, 424 U.S. at 335).  And because lawfully confined inmates already "have their liberty curtailed by definition," their private interests against "even more confined situations" are somewhat limited—at least when compared to a non-incarcerated person's interest in avoiding confinement altogether.  *Wilkinson*, 545 U.S. at 225; *Hewitt*, 459 U.S. at 475.

The appropriate level of flexibility depends on the nature of the specific proceeding at issue.  Even within prisons, *Wolff v. McDonnell* prescribes relatively rigorous procedural safeguards before officials can punish an inmate for serious alleged misconduct: formal notice of the charges provided in writing 24 hours before a hearing, a written statement describing the factfinder's relied-upon reasons, and—to the extent practicable—an opportunity for the inmate to call witnesses and present exculpatory evidence.  418 U.S. at 563, 566–67.  These quasi-adversarial features are instrumental for "elicit[ing] specific facts."  *Greenholtz v. Inmates of Neb. Penal and Corr. Complex*, 442 U.S. 1, 14 (1979).  And written records "protect the inmate against collateral consequences"—like administrative segregation—"based on a misunderstanding of the nature of the original proceeding."  *Wolff*, 418 U.S. at 565.

By contrast, administrative or managerial decisions, including non-punitive classification to administrative segregation, call for more relaxed procedures.  *Hewitt*, 459 U.S at 472–77; *Wilkinson*, 545 U.S. at 228–29.  The government's interests dominate within the prison-management context.  *Wilkinson*, 545 U.S. at 227.  And *Wolff*'s quasi-adversarial requirements don't provide much value to administrators making judgment-laden decisions that account for

inmate needs and broader institutional security considerations. *See Hewitt*, 459 U.S at 473–74; *Greenholtz*, 442 U.S. at 14.

It is unclear precisely what additional procedural safeguards are required where, as here, an inmate's classification to administrative segregation is triggered by the outcome of a formal disciplinary proceeding. But *Hewitt*, which involved placement in administrative segregation before formal adjudication of any misconduct charges, sets the outer boundary. *See* 459 U.S. at 476. To the extent that an inmate has a liberty interest in avoiding administrative segregation, prison officials satisfy due process by conducting "an informal, nonadversary evidentiary review." *Id.* That review process includes giving the inmate "some notice" and "an opportunity to present his views"—either orally or in writing—"to the prison official charged with deciding whether to transfer him to administrative segregation." *Id.* Then, once the inmate is placed in segregated housing, due process further requires "periodic review" of his confinement to ensure it is supported by "some evidence." *Selby v. Caruso*, 734 F.3d 554, 559 (6th Cir. 2013) (citation omitted); *see also Hewitt*, 459 U.S. at 477 n.9.

Given that framework, Finley received the process due. Consider the undisputed facts: A hearing officer adjudicated Finley guilty of a serious contraband violation in a proceeding that all agree meets *Wolff*'s requirements. The next day, a Huss-led Security Classification Committee met to determine whether, as a result of his contraband violation, Finley needed to be placed in administrative segregation. Finley personally appeared before the Committee and argued against segregation by emphasizing his mental health. After reviewing the record from Finley's misconduct hearing, the Committee members nonetheless found segregation necessary. They issued a written classification notice citing his contraband violation and inability to be managed in the general population. Then, throughout Finley's three months in segregation, Schroeder and other officials periodically reviewed his placement. They repeatedly visited him and issued regular reports citing his contraband violation and his placement on the Interim Care Program waitlist. Those procedures comfortably satisfy constitutional requirements.

Finley pushes back. He asserts that his process was deficient for four main reasons: he received inadequate notice, officials failed to properly consider his mental illness, his periodic

reviews were perfunctory, and he could not participate in the Committee's October reclassification meeting. We are not persuaded.

***Adequacy of Notice.*** Finley first disputes the adequacy of his notice, emphasizing the distinction between his contraband disciplinary hearing and the next day's security-classification hearing. In the former, a hearing officer found Finley guilty of the razorblade-contraband violation and punished him with revoked privileges. That guilty verdict triggered the latter proceeding, where Huss's Security Classification Committee classified Finley to administrative segregation. All agree that Finley received adequate notice for his disciplinary hearing. But in Finley's view, he *also* needed formal notice for the security-classification hearing because it addressed a different question and was conducted by different officials.

Finley's proposed approach clashes with the deference and flexibility that we must afford prison administrators. *See Hewitt*, 459 U.S. at 472. The two proceedings, though distinct, were highly interrelated. After all, Finley's underlying disciplinary infraction prompted the Committee's classification meeting and formed the primary factual basis for his placement in administrative segregation. Finley wasn't entitled to separate formal notice for the follow-up classification proceeding. *See Rimmer-Bey*, 62 F.3d at 791 (suggesting in dicta that no follow-up hearing at all is necessary when administrative-segregation placement "was anchored in the findings of guilt" at a prior misconduct hearing).

That result makes sense. By affording Finley detailed written notice more than 24 hours before his disciplinary hearing, prison officials enabled him to "marshal the facts and prepare a defense" against the charges and associated consequences. *Wolff*, 418 U.S. at 564. And Finley took full advantage. He used the hearing to argue that his mental illness prevented him from controlling his actions and that he needed treatment rather than discipline or segregation. To aid the decisionmaker, Salmi provided a sanction assessment where she flagged the danger of solitary confinement. Ultimately, that disciplinary proceeding created a written record that Huss and the other Committee members reviewed the following day when making their classification decision. To the extent that Finley was also entitled to participate in the Committee's classification proceeding, same-day oral notice sufficed. *See Hewitt*, 459 U.S. at 474–76 (prescribing an "informal nonadversary review of evidence" and "some notice"); *see also*

*Powell*, 720 F. App'x at 226–27 (considering whether the inmate received formal notice for his disciplinary hearing without addressing notice requirements for his subsequent classification to segregation).

***Consideration of Mental Health.*** Second, and most forcefully, Finley argues that the Committee deprived him of due process by classifying him to administrative segregation without properly considering the mental-health implications. His evidence paints a troubling picture. The three-person Committee included a mental-health professional, but that mental-health professional wasn't personally familiar with Finley's diagnosis. Nor did the professional believe that he was empowered to suggest alternatives to segregation at the Committee meeting. Accordingly, the panel never discussed such alternatives. And when filling out the notice form, the Committee left the mental-health section blank.

Still, Finley's evidence falls short of establishing a due process violation. Assuming that due process required consideration of Finley's mental health, the Committee members cleared that threshold: They reviewed paperwork from his misconduct hearing, which included Finley's statement pertaining to his mental health. Huss, the Committee's chairperson, read Salmi's warning that prolonged confinement in segregation would likely harm Finley's mental health. And the Committee invited Finley to attend its meeting, allowing him to make further arguments about his mental health. That sufficed. The Due Process Clause does not require the active participation of a medical expert on the decisionmaking panel, and it isn't violated by officials' failure to complete each section of a classification form. *See Hewitt*, 459 U.S. at 472; *see also Bills v. Henderson*, 631 F.2d 1287, 1298–99 (6th Cir. 1980) (noting that deviations from state-created procedural rules do not necessarily amount to due process violations).

To be clear, this hardly justifies the Committee's ultimate conclusion. Far from it. Huss and the other Committee members assigned Finley to administrative segregation despite serious mental-health risks. Due to the procedures that were followed, those risks were readily apparent to the Committee. Huss's decision to disregard those risks might have violated Finley's Eighth Amendment rights, but the procedures behind her decision were not flawed enough to create a separate due process violation.

*Periodic Reviews.*   Finley next targets the manner in which prison officials periodically reviewed his placement in segregation.  Relying primarily on *Selby v. Caruso*, he describes those periodical reviews as "perfunctory and meaningless."   734 F.3d at 560.   Specifically, he complains that prison officials documented each review with only a single sheet of paper reciting boilerplate language.  None of those review forms, he adds, discussed his health or his ongoing behavior in administrative segregation.

This argument is meritless.  First, *Selby* is distinguishable.  There, the inmate's periodic reviews occurred over thirteen years while he remained in administrative segregation.  *Id.* at 559–60.  The inmate had also presented evidence that his reviews were a "sham" because a top correctional official had already placed a hold on his status, preordaining the review process's outcome.  *Id.* at 557, 560.  At one point, prison officials even overrode the inmate's qualification for a lower security classification.  *Id.* at 560.  And the inmate had committed only four rule violations in his last decade of administrative segregation.  *Id.* at 558, 560.  Altogether, this Court concluded that material issues of fact existed concerning whether the inmate's thirteen-year confinement in segregation was supported by "some evidence."   *Id.* at 559 (citation omitted).   By contrast, Finley's review process lasted for less than three months before his transfer to the Interim Care Program.  Most of his periodic-review forms explicitly mentioned his placement on the program's waitlist.  They all cited his recent contraband misconduct.  And unlike the inmate in *Selby*, Finley provides no evidence supporting his accusation that his reviews were perfunctory or meaningless.

Our decision in *Harris v. Caruso* further reinforces the sufficiency of Finley's reviews. 465 F. App'x 481, 485–86 (6th Cir. 2012).  The periodic-review process at issue in *Harris* was virtually identical to Finley's—except it continued for eight years rather than three months.  *See id.* at 482, 485–86.  We deemed it sufficiently meaningful.  In reaching that conclusion, we noted (among other things) that the inmate received regular opportunities to participate in interviews. In addition, the inmate's review forms often cited examples of his prior major misconduct.  *Id.* at 485–86.   Given Finley's comparatively brief stint in segregation, his similar review process passes constitutional muster.

***October Reclassification.***   Finally, Finley challenges the procedures used in the Security Classification Committee's October reclassification meeting.   In that meeting, which occurred about two weeks after the Committee initially classified Finley to administrative segregation, a Schroeder-led panel revisited Finley's classification and opted to keep him in segregation. Finley complains that he wasn't invited to attend.   He also argues that, just like in the prior September meeting, the Committee failed to adequately consider his mental health.   In response, the deputy wardens assert that the October meeting was unnecessary under prison procedures and had been scheduled in error.

We agree with Finley that unresolved factual issues remain on whether the October meeting was scheduled in error.   However, that doesn't ultimately matter.   Even assuming that Schroeder intentionally scheduled the meeting to comply with prison policy, Finley was not entitled to participate or raise additional mental-health arguments.   As explained above, Finley had already received adequate process when the Committee initially assigned him to segregation in September.   He also received meaningful periodic reviews throughout his stay in segregated housing.   No additional process was constitutionally necessary.   The Committee's choice to meet again and reconsider Finley's classification did not automatically trigger additional constitutionally mandated procedural safeguards.   *See Bills*, 631 F.2d at 1298–99.   Such a rule, after all, would discourage officials from taking extra precautionary measures to minimize the possibility of error.

Resisting that conclusion, Finley argues that he nonetheless deserved process at the October meeting because it "resulted in a written order that had effect."   Reply Br. 26.   But he fails to elaborate.   He does not dispute that, at the time of the October meeting, he had already been officially classified to administrative segregation.   He never alleges that the October notice form changed the nature or duration of his ultimate confinement in segregation.   And he does not suggest that Schroeder relied on the October meeting—or even the disobeying-a-direct-order misconduct that precipitated it—when she kept him in segregation.   Indeed, none of the periodic review forms mentioned the October events at all; they specifically cited Finley's September contraband misconduct.    In sum, Finley cannot show that the Committee's October reclassification meeting had independent significance requiring more procedural safeguards.

## V. DISABILITY DISCRIMINATION

Finally, Finley brings statutory discrimination claims under Title II of the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act (RA).[13] Those statutes prohibit public or federally funded entities, including prisons, from discriminating against disabled individuals while operating services or programs. *See Knox County v. M.Q.*, 62 F.4th 978, 999–1000 (6th Cir. 2023) (citing 42 U.S.C. § 12132 and 29 U.S.C. § 794). Given the statutes' similar requirements, courts generally evaluate ADA and RA claims together. *Id.* at 1000.

To prevail under either statute, a plaintiff must establish that (1) he has a qualifying disability, (2) he is otherwise qualified for a program, and (3) he was excluded from participation in, denied the benefits of, or subjected to discrimination under a program because of his disability. *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 453 (6th Cir. 2008). On top of that, RA claims— unlike ADA claims—impose an extra causation requirement: the plaintiff must show that the discrimination was "solely" because of his disability. *See Lewis v. Humbolt Acquisition Corp.*, 681 F.3d 312, 317 (6th Cir. 2012) (en banc); *Anderson v. City of Blue Ash*, 798 F.3d 338, 357 n.1 (6th Cir. 2015).[14] All agree that Finley satisfies the first two elements—his bipolar disorder counts as a disability, and he is otherwise qualified for prison programs. Finley's statutory claims thus ultimately turn on the third and final element.

Plaintiffs may satisfy that final element using two different theories: failure to reasonably accommodate and intentional discrimination. *Knox County*, 62 F.4th at 1000. Finley brings claims under both theories. He first argues that the deputy wardens failed to reasonably accommodate his mental illness by refusing to promptly place him in a mental-health program or otherwise modify the conditions of his confinement. He then separately alleges that the deputy

---

[13]Unlike his constitutional claims, Finley brings these statutory claims against Huss and Schroeder in their official capacities. Sovereign immunity is inapplicable because Michigan has waived that defense against RA claims, *see Gean v. Hattaway*, 330 F.3d 758, 775 (6th Cir. 2003), and Title II of the ADA abrogates sovereign immunity in cases where alleged discriminatory conduct independently violates the Constitution, *see United States v. Georgia*, 546 U.S. 151, 157–59 (2006).

[14]In addition, the RA applies only to federally funded entities. *Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 324 (6th Cir. 2023). No party disputes that MDOC receives the requisite federal funding.

wardens intentionally discriminated against him by assigning him to segregation because of his disability. Finley falls short on both theories.

## A.    Failure to Accommodate

We start with Finley's failure-to-accommodate claim. To prevail under this theory, a plaintiff must show that the defendant reasonably could have accommodated his disability but refused to do so. *Knox County*, 62 F.4th at 1000. Relatedly, the plaintiff must prove that the failure to accommodate impeded his ability to participate in or benefit from a program or service. *Id.* Because failing to grant a reasonable accommodation is itself direct evidence of discrimination, plaintiffs who meet this burden need not provide additional evidence of discriminatory intent.[15] *See, e.g.*, *Keller v. Chippewa Cnty. Bd. of Comm'rs*, 860 F. App'x 381, 385–86 (6th Cir. 2021); *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 908–09 (6th Cir. 2004).

The determination of what counts as a reasonable accommodation is specific to each case. *Bennett*, 86 F.4th at 326. Covered entities must make "reasonable modifications in policies, practices, or procedures" when such modifications are "necessary to avoid discrimination on the basis of disability." But entities need not grant an accommodation if they can prove that it would impose "undue financial and administrative burdens" or "fundamentally alter the nature" of their services or programs. 28 C.F.R. §§ 35.130(b)(7), 35.150(a)(3) (implementing Title II of the ADA); *see also McPherson v. Mich. High Sch. Athletic Ass'n*, 119 F.3d 453, 459–60, 463 (6th Cir. 1997) (en banc) (explaining that RA failure-to-accommodate claims follow the same framework). Moreover, plaintiffs are not entitled to their "preferred" accommodation; rather, an accommodation suffices if it provides the plaintiff "meaningful access" to the covered entity's programs or services. *Bennett*, 86 F.4th at 326 (quoting *Ability Ctr.*, 385 F.3d at 907).

---

[15]The deputy wardens seemingly argue that a plaintiff cannot bring a failure-to-accommodate claim unless he first establishes a claim of intentional discrimination. That is wrong. Our caselaw makes clear that intentional discrimination and failure to accommodate are independent theories. *E.g.*, *Bennett*, 86 F.4th at 326 (collecting cases); *see also Roel v. Hamilton County*, 870 F.3d 471, 488 (6th Cir. 2017) (criticizing the district court for dismissing an ADA claim that lacked evidence of intentional discrimination without also considering the plaintiff's failure-to-accommodate theory).

Finley requested two different accommodations for his disability. First, he asked Huss and Schroeder for placement in a mental-health treatment program. At his Security Classification Committee hearing on September 27, for example, he asked Huss for mental-health treatment instead of discipline. And during his time in administrative segregation, he repeatedly asked Schroeder to place him in the Interim Care Program. Second, Finley also asked Schroeder to modify his conditions in administrative segregation to make them less restrictive. Specifically, he told her that he wanted to be moved to a different segregation cell that was less isolating than his base-level cell.

We turn first to Finley's request for placement in a mental-health treatment program. To begin, Finley meets his burden of showing that this was an actionable accommodation request under the ADA and RA. A jury could find that failing to grant such an accommodation would impede Finley's access to prison services or programming. *See Keller*, 860 F. App'x at 386 (explaining that "services, programs, and activities" under the ADA encompass "virtually everything" a prison does, including recreational activities and medical care); *cf. Harvard v. Inch*, 411 F. Supp. 3d 1220, 1241 (N.D. Fla 2019) (noting that prisons must make reasonable accommodations if necessary to afford mentally ill inmates access to safe housing or living conditions that won't directly exacerbate their disabilities). A jury could similarly find that an accommodation was "necessary" to avoid discrimination on the basis of Finley's disability. *See Madej v. Maiden*, 951 F.3d 364, 373 (6th Cir. 2020) (emphasis omitted) (quoting 28 C.F.R. § 35.130(b)(7)). After all, "but for" for his mental illness, Finley would not have needed an accommodation to access basic prison services. *See id.* A mentally stable person in Finley's position would have experienced living conditions in segregated housing that—though restrictive—wouldn't have produced nearly the same deleterious impact. Finally, this record could support a finding that the requested accommodation was reasonable. Salmi formally requested Finley's transfer to the Interim Care Program, and Schroeder quickly agreed that such a transfer was appropriate.

Finley's problem, however, is that the deputy wardens *did* provide his requested accommodation—albeit after a delay.**[16]** Schroeder promptly ensured that Finley's name was placed on the Interim Care Program's waitlist, and Finley joined the program when a spot became available. The issue, then, is the extent to which the delay in placing him in the treatment program is actionable as a failure to accommodate. We haven't foreclosed the possibility that a delay-in-accommodation theory is colorable under certain circumstances. *See Newell v. Cent. Mich. Univ. Bd. of Trs.*, No. 20-1864, 2021 WL 3929220, at \*8 (6th Cir. Sept. 2, 2021). Indeed, plaintiffs can likely bring such claims when delays are attributable to intentional obstruction tactics or bad faith. *See id.* at \*9 (citing *Brumley v. UPS*, 909 F.3d 834, 840 (6th Cir. 2018)). But we decline to endorse such a theory where delays are merely the result of internal processing issues or matters outside the entity's control—at least when such delays are of modest length. *See Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 812–13 (6th Cir. 2020); *Gerton v. Verizon S. Inc.*, 145 F. App'x 159, 168 (6th Cir. 2005).

Finley cannot show that the deputy wardens failed to accommodate his disability by delaying his transfer to the Interim Care Program. The record reveals that the delay—which lasted less than three months—stemmed from internal processing constraints outside the prison's control. The Interim Care Program had limited space. To the extent that Finley frames his requested accommodation as a demand for *immediate* placement in the program, we consider such a request unreasonable under the circumstances. Anti-discrimination statutes did not require prison officials to rearrange the mental-health program's waitlist to create an instant spot for Finley. That's true even though those officials had some flexibility in adjusting the waitlist. *Contra infra* at 44 (Gilman, J., dissenting in part). After all, such a modification would accommodate Finley's mental illness only at the expense of other mentally ill inmates. Indeed, we should be mindful of the deputy wardens' penological expertise in reviewing the reasonableness of proposed accommodations to prison operations. *Cf. Knox County*, 62 F.4th at 1000 (urging judicial deference to school administrators' educational expertise).

---

**[16]**Contrary to Judge Gilman's assertion, we do not hold that the deputy wardens accommodated Finley's disability by merely placing him on a waitlist. *See infra* at 43–44 (Gilman, J., dissenting in part). They accommodated Finley's disability by transferring him to the Interim Care Program. The waitlist is relevant, though, because it shows when prison officials approved—and started processing—Finley's requested accommodation.

We turn next to Finley's alternative request that Schroeder accommodate his disability by temporarily moving him to a less restrictive cell in administrative segregation until a spot in the Interim Care Program became available.  Finley hasn't met his burden of showing that such an accommodation was "necessary" to avoid disability discrimination. *See Madej*, 951 F.3d at 373 (emphasis omitted) (quoting 28 C.F.R. § 35.130(b)(7)).  Granted, Finley has shown that conditions in administrative segregation exacerbated his disability and that transfer to a treatment program was necessary to ensure his "meaningful access" to safe living conditions. *See Keller*, 860 F. App'x at 386 (quoting *Ability Ctr.*, 385 F.3d at 909).  But it is far less clear (on this record, at least) that temporary placement in a different segregation cell, albeit a somewhat less isolating one, would sufficiently address the problem and facilitate the statutorily required access to prison services.  The ADA and RA do not require entities to grant every accommodation request that might incrementally improve living conditions—especially when a far more significant accommodation is already in process.[17]  That rings particularly true in the correctional context, where prison administrators must safely manage thousands of inmates with varying needs.  Finley does not have a viable failure-to-accommodate claim.

## B.     Intentional Discrimination

Finley also seeks relief under an intentional-discrimination theory.  To successfully bring an intentional-discrimination claim, a plaintiff must show unfavorable treatment on the basis of his disability. *Knox County*, 62 F.4th at 1000.  Proof of the defendant's motive is key. *Id*.  After all, the plaintiff must prove that his disability caused the defendant's discriminatory behavior— either the "but-for cause" for ADA claims, or the sole reason for RA claims. *M.J. ex rel. S.J. v. Akron City Sch. Dist. Bd. of Educ.*, 1 F.4th 436, 453 (6th Cir. 2021) (citation omitted).  And the defendant must act intentionally. *Anderson*, 798 F.3d at 357.  Plaintiffs can avoid summary judgment by relying on either direct or indirect evidence of the defendant's discriminatory intent. *M.J.*, 1 F.4th at 452.

---

[17]That said, the fact that Schroeder didn't take steps to mitigate the risk of harm—such as by temporarily moving Finley to a less restrictive cell or waiving the loss-of-privileges sanction that curbed his out-of-cell time—is relevant to the distinct Eighth Amendment question of whether she was deliberately indifferent to the risk.

**1.** **Direct Evidence**

Finley argues that he has direct evidence of discrimination. We analyze claims under a direct-evidence framework when the defendant has "admitted" discriminatory intent by acknowledging that it relied on the plaintiff's disability. *Morrisey v. Laurel Health Care Co.*, 946 F.3d 292, 297–98 (6th Cir. 2019) (citation omitted). Direct evidence is a "smoking gun" and "does not require the fact finder to draw any inferences to reach the conclusion that unlawful discrimination was at least a motivating factor." *Gohl v. Livonia Pub. Schs. Sch. Dist.*, 836 F.3d 672, 683 (6th Cir. 2016) (citation omitted).

Finley's direct-evidence argument proceeds in three steps. First, he correctly observes that the deputy wardens openly based their classification decisions on his misbehavior, including his contraband misconduct for failing to return a razorblade. He then cites his psychiatric expert's (likely accurate) opinion that such misbehavior is strongly tied to Finley's underlying mental illness. Thus, he concludes, the deputy wardens effectively admitted to discriminating against him on the basis of his mental illness. For support, Finley relies on *EEOC v. Dolgencorp, LLC*, 899 F.3d 428 (6th Cir. 2018). In his view, *Dolgencorp* says that direct evidence of discrimination exists whenever a defendant's stated reason for an adverse action is behavior that can be traced to the plaintiff's disability.

But *Dolgencorp* stands for a far narrower principle. It holds only that a defendant cannot unreasonably deny a plaintiff's requested accommodation to a generally applicable policy, and then use that neutral policy as a purportedly nondiscriminatory basis for taking an adverse action. *Id.* at 435. In that case, a diabetic cashier had requested an accommodation to her employer's policy against eating or drinking during work. The employer illegally denied the accommodation, apparently unmoved by the cashier's explanation that her diabetes sometimes compelled sugar consumption at a moment's notice. *Id.* at 432, 434–35. The employer later fired the cashier after she drank (and paid for) orange juice from the checkout cooler during an emergency low-blood-sugar episode. *Id.* at 432. Because its failure to grant a reasonable accommodation constituted direct evidence of discrimination, we rebuffed the employer's attempt to rely on its neutral policy as a nondiscriminatory basis for firing the cashier. *Id.* at 435.

Unlike the *Dolgencorp* cashier, Finley cannot show that the deputy wardens denied him a reasonable accommodation. And he certainly cannot show that they unreasonably denied him an accommodation to the prison's generally applicable policies against, say, possessing dangerous contraband. That effectively forecloses his direct-discrimination argument. After all, *Dolgencorp* never suggested that ties between a plaintiff's rule-breaking conduct and a disability—standing alone—automatically bar the defendant from enforcing its neutral rules. The deputy wardens' open reliance on Finley's misconduct is no "smoking gun." *See Gohl*, 836 F.3d at 683. At best, the nexus between Finley's misconduct and psychiatric disorders amounts to indirect evidence of discrimination.

### 2.       Indirect Evidence

When evaluating intentional-discrimination claims that rely on indirect evidence, courts employ a burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The plaintiff must first establish a prima facie case of discrimination. Then the defendant must offer a legitimate, nondiscriminatory reason for its challenged action. Finally, the plaintiff bears the burden of showing that the defendant's proffered reason is pretextual. *Sjostrand v. Ohio St. Univ.*, 750 F.3d 596, 599 (6th Cir. 2014) (citing *McDonnell Douglas*, 411 U.S. at 802–04).

Even assuming that Finley established a prima facie case, he cannot show that the deputy wardens' reason for placing him in administrative segregation was pretextual. The record makes clear that Finley's conduct—not his disability—motivated their action. After all, the deputy wardens explicitly cited his contraband violation and his "inability to be managed with general population privileges" in paperwork contemporaneous with Finley's initial assignment. Corr. Recs., R-88-6 at PageID 754. They also later offered deposition testimony suggesting that they factored in Finley's lengthy history of misconduct and "his potential to honor the trust implicit in a lower level of security." Huss Dep., R.88-9 at PageID 817. Finley cannot dispute that he has a lengthy history of rule infractions. And although he quibbles with some of the deputy wardens' after-the-fact explanations, Finley does not contest that his recent misconduct had prompted their decision to put him in segregation.

He instead underscores the nexus between his mental illness and rule violations, directing us to his psychiatric expert's opinion connecting the two. The contraband violation is most illustrative. Sanctioning Finley for failing to return a razorblade that he later swallowed, the argument goes, is evidence of disability discrimination because "swallowing a razor is behavior that simply does not occur absent serious mental illness." Opening Br. 52. Finley is certainly correct that razor-swallowing and mental illness are "plainly intertwined." *Id.* And it is probably true that disciplining an inmate for self-harm constitutes evidence—likely even direct evidence—of disability discrimination. In such a case, no daylight separates the conduct and disability.

But Finley was not sanctioned for swallowing a razor. Rather, prison officials charged him for hiding the razor and refusing to return it when asked. Granted, Finley's mental illness likely motivated that misconduct, and he later would use the same razor for self-harm. Yet that doesn't sufficiently close the gap between conduct and disability. After all, there are many reasons—not necessarily connected to disability—for inmates to keep dangerous contraband. And in Finley's case, Salmi had explicitly informed prison officials that Finley's mental illness hadn't affected the charged conduct. An official hardly engages in intentional discrimination by enforcing broadly applicable prison rules while relying on a medical professional's opinion that the disability and conduct were distinct. Inmates cannot avoid that result by later relying on contrary expert opinions to create material issues of fact. Such a rule would clash with the statutory requirement that actionable discrimination is "intentional." *See Anderson*, 798 F.3d at 357. It would also deeply undermine prison officials' capacity to ensure prison security and safety.

## VI. CONCLUSION

We **AFFIRM** the district court's judgment as to Finley's procedural due process and statutory claims. But we **REVERSE** the district court's judgment as to Finley's Eighth Amendment claim and **REMAND** for further proceedings consistent with this opinion.

———————————————————

**CONCURRENCE / DISSENT**

———————————————————

RONALD LEE GILMAN, Circuit Judge, concurring in part and dissenting in part.  I agree with the majority's conclusions that summary judgment for the defendants was warranted for Finley's procedural due-process and intentional-discrimination claims, but not warranted for his Eighth Amendment claim.  I respectfully disagree, however, that summary judgment for the defendants was warranted for Finley's failure-to-accommodate claim under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.  There are facts in the record that would permit a reasonable jury to find that the deputy wardens, Erica Huss and Sarah Schroeder, failed to implement Finley's requested accommodations, and that those accommodations were reasonable, necessary to avoid disability discrimination, and not unduly burdensome.  Because genuine disputes of material fact exist on this issue, I would reverse the district court's grant of summary judgment for the defendants on Finley's failure-to-accommodate claim and remand for further proceedings.

## I.  FAILURE TO ACCOMMODATE

To succeed on a failure-to-accommodate claim, a plaintiff "must show that the defendant reasonably could have accommodated his disability but refused to do so, and that this failure to accommodate 'imped[ed] [his] ability to participate in, or benefit from, the subject program.'" *Knox County v. M.Q.*, 62 F.4th 978, 1000 (6th Cir. 2023) (alterations in original) (quoting *Campbell v. Bd. of Educ. of Centerline Sch. Dist.*, 58 F. App'x 162, 166 (6th Cir. 2003)). Implementing regulations do not require governmental entities to make such accommodations if doing so "would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens."  28 C.F.R. § 35.150(a)(3).  Furthermore, this court has held that plaintiffs are not entitled to their "preferred accommodations, but merely a reasonable one that provides meaningful access to the public entity." *Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 326 (6th Cir. 2023) (internal quotations marks and citations omitted).

Determining whether an accommodation is reasonable or unduly burdensome is "highly fact-specific, requiring case-by-case inquiry." *Id.* (quoting *Roell v. Hamilton County*, 870 F.3d 471, 489 (6th Cir. 2017)); *see also Blanchet v. Charter Commc'ns, LLC*, 27 F.4th 1221, 1230–31 (6th Cir. 2022) (same). When evaluating the defendants' motion for summary judgment, the facts in that inquiry must be viewed in the light most favorable to Finley, and all inferences must be drawn in his favor. *See Anderson v. City of Blue Ash*, 798 F.3d 338, 350 (6th Cir. 2015).

Finley made two requested accommodations while in administrative segregation: (1) placement in a mental-health treatment program, and (2) placement in a less isolated cell. Huss and Schroeder argue that immediate placement into the Interim Care Program, an outpatient mental-health program for prisoners housed in administrative segregation, would have constituted an undue administrative burden because other prisoners were ahead of Finley on the program's waitlist.

But the deputy wardens' appellate briefing is bereft of any argument regarding why they did not move Finley in the meantime to a cell with windows or to one with less restrictive conditions. During oral argument, however, counsel argued that Finley was not moved to less-isolating conditions in order to prevent his access to razor blades and to avoid further self-harm.

I first consider Finley's request for placement into a mental-health treatment program. The majority concedes that the record before us could support a jury finding that the requested accommodation was reasonable, that it was necessary to avoid disability discrimination, and that the failure to grant the accommodation impeded Finley's access to needed prison services. Maj. Op. at 36. Yet Finley's claim fails, according to the majority, because the deputy wardens "*did* provide his requested accommodation" by placing him on the waitlist for the Interim Care Program. *Id.* at 37 (emphasis in original). The majority reasons that the 79-day delay between Finley's placement in administrative segregation and his transfer to the Interim Care Program "stemmed from internal processing constraints outside the prison's control," and that immediate placement into the program would have unduly burdened prison operations. *Id.*

But Finley's requested accommodation was for placement in the Interim Care Program, not simply for placement on a waitlist. Although the deputy wardens allege that placement in the Interim Care Program was not immediately available because other prisoners were ahead of Finley on the waitlist, there is evidence in the record suggesting that the waitlist was not immutable. During the extended time that Finley languished in a base-level cell in administrative segregation, Schroeder met weekly with mental-health professionals and housing staff to discuss the Interim Care Program's waitlist. According to her deposition testimony, prisoners can be moved up or down the waitlist depending on their behavior and the severity of their mental-health needs. And Finley's own deposition reveals that during Schroeder's weekly visits to his cell, she told him that placement into the program was contingent upon his behavior.

There is no requirement to "immediately implement or accept accommodations," and "a delay in providing a reasonable accommodation is not always actionable." *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 812–13 (6th Cir. 2020) (citing *Gerton v. Verizon S. Inc.*, 145 F. App'x 159, 168 (6th Cir. 2005)). But the record before us is unclear as to whether the delay in Finley's placement in the Interim Care Program sufficiently accommodated his disability or whether the delay was due to factors outside of the deputy wardens' control. A reasonable jury could conclude that Schroeder used placement into the Interim Care Program as an incentive for Finley to improve his behavior despite the accommodation being "necessary [for him] to avoid discrimination on the basis of [his] disability." *See Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 326 (6th Cir. 2023) (quoting 28 C.F.R. § 35.130(b)(7)(i)).

Reasonable jurors could find that Schroeder failed to accommodate Finley's disability by intentionally delaying his transfer to the Interim Care Program while knowing that prolonged segregation in harsh conditions would likely worsen his mental health and could lead to more self-harm. A jury might thus conclude that the delay in Finley's placement into the Interim Care Program was not due to "internal processing constraints outside the prison's control." Maj. Op. at 37. Such "weighing of evidence, and . . . drawing of legitimate inferences from the facts are jury functions, not those of a judge" considering a motion for summary judgment. *Blanchet v. Charter Commc'ns, LLC*, 27 F.4th 1221, 1226 (6th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

The majority also concludes that Finley's request for better conditions while he was in administrative segregation fails to support his failure-to-accommodate claim. Maj. Op. at 38. Although Finley presented evidence that conditions in the base-level cell exacerbated his disability, the record is unclear, according to the majority, as to whether temporary placement in less restrictive conditions would have sufficiently ameliorated the problem and facilitated Finley's access to required prison services. *Id.*

Reasonable accommodations are required when they "are necessary to avoid discrimination on the basis of disability." *Madej v. Maiden*, 951 F.3d 364, 373 (6th Cir. 2020) (quoting 28 C.F.R. § 35.130(b)(7)(i)). Such a necessity exists when "a plaintiff 'shows that, but for [his] disability, [he] would have been able to access the services or benefits desired.'" *Id.* (quoting *Wis. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 752 (7th Cir. 2006)) (cleaned up).

Weeks before Finley was placed in his base-level cell in administrative segregation, he rapidly decompensated and engaged in further self-harm by overdosing on medication, swallowing razorblades, and cutting himself. On October 25, 2016, prison officials transferred Finley from a suicide-observation cell to administrative segregation, where he would remain until January 11, 2017. Just two days after Finley's transfer, Mandi Salmi, Finley's assigned mental-health professional, emailed Schroeder to request that Finley be released to the Interim Care Program and warning that Finley's "treatment needs cannot be met while in segregation placement." During this time in administrative segregation, Finley took his prescribed medication and stopped harming himself. Nevertheless, Finley's deposition testimony makes clear that he felt "entombed" in his base-level cell and requested to be moved to a cell with windows and from which he could communicate with others.

As the majority acknowledges, the conditions in Finley's base-level cell were particularly restrictive. Maj. Op. at 10–11. Finley spent 79 days alone in a windowless cell where he was unable to communicate with anyone because of sound-proof security glass and large industrial fans that drowned out all outside noise. *Id.* He enjoyed only eight hours of exercise over this entire period of near-total isolation. Although Finley stopped harming himself while housed in

the base-level cell, the psychiatrist retained by Finley determined that Finley's experience there resulted in severe trauma akin to post-traumatic stress disorder.

A reasonable jury could conclude that, "but for" Finley's disability, his experience in base-level administrative segregation would not have had such a deleterious effect on his health. *See Madej¸* 951 F.3d at 373; *see also Brown v. Meisner*, 81 F.4th 706, 709 (7th Cir. 2023) (finding a viable failure-to-accommodate claim where a disabled prisoner's request for cell conditions that would not aggravate his disability went unaddressed). And although placement in better conditions might have been unduly burdensome to the prison, the deputy wardens point to no facts in the record supporting such a conclusion. Whether a less isolated cell in administrative segregation would have permitted Finley to avoid discrimination on the basis of his disability thus remains a question of fact for a jury.

## II. CONCLUSION

In sum, there are genuine disputes of material fact regarding Finley's two requested accommodations. This should preclude the grant of summary judgment in favor of the defendants on Finley's failure-to-accommodate claim. *See Anderson v. City of Blue Ash*, 798 F.3d 338, 356 (6th Cir. 2015). I therefore respectfully dissent on this issue.

—————————————————————

**CONCURRENCE / DISSENT**

—————————————————————

THAPAR, Circuit Judge, concurring in part and dissenting in part. Timothy Finley was not your average inmate. He had over 300 misconduct charges and showed no signs of slowing down. Some violations were violent. Many were sexual. All proved that Finley refused to obey prison rules.

Finley not only threatened others' safety; he also risked his own, cutting himself and swallowing razors. Trying to protect Finley, the wardens—Erica Huss and Sarah Schroeder— moved him in and out of suicide observation when they believed he posed a threat. That didn't solve the problem. Finley snuck razors into observation and swallowed them. Why? Finley explained he reached a breaking point because his cell area was too loud. He wanted into a mental-health treatment center where it's quieter. Finley's doctor, however, thought his illness was manageable and his self-harm calculated. So she declined to refer Finley to the treatment center.

That left the wardens to figure out how to keep Finley—and everyone else—safe. General population obviously wasn't an option. Suicide observation wasn't working. And his doctor didn't refer him to the treatment center. That left segregation. The wardens met with mental-health professionals, who didn't object to moving Finley to segregation. No binding caselaw forbade the transfer, either. So the wardens moved Finley to a segregation cell and kept him there until his doctor referred him to the treatment center.

Was it reasonable to move Finley to segregation? More importantly, could *any* reasonable warden conclude that segregation was acceptable? Of course. The majority says otherwise. So I dissent in part.

I.

Start with the obvious: Huss and Schroeder were in a tough spot. By segregating Finley, they followed what any reasonable warden does with inmates who can't be managed in the

general population.  *See Hewitt v. Helms*, 459 U.S. 460, 468 (1983) ("[A]dministrative segregation is the sort of confinement that inmates should reasonably anticipate receiving."). What other option did they have?  If they kept Finley in suicide observation or the general population, he'd get another razor and harm himself—and then he'd sue, saying they didn't do enough to protect him.  *See Perez v. Oakland Cnty.*, 466 F.3d 416, 424–25 (6th Cir. 2006) (arguing defendants shouldn't have released inmate from restrictive observation cell).  Or he'd harm someone else—and then that person might sue, saying Huss and Schroeder acted unreasonably by failing to segregate Finley.  *See Rager ex rel. G.C. v. McMinn Cnty.*, No. 21-5987, 2023 WL 4927252, at *2 (6th Cir. Aug. 2, 2023) (arguing officer "had a duty to immediately segregate" a dangerous inmate).

Qualified immunity was made for situations like this.  Balancing inmates' rights and trying to keep everyone safe isn't an easy task.  That's why wardens get "wide-ranging deference" in their judgment calls.  *Hewitt*, 459 U.S. at 472 (citation omitted).  That's why wardens can't be held liable for decisions they reasonably believe are constitutional—otherwise, they might shirk their duties for fear of being sued.  *See Anderson v. Creighton*, 483 U.S. 635, 638 (1987).  And that's why, to succeed on his claim, Finley must identify a binding case "clearly prohibit[ing]" the wardens' decision "in the particular circumstances" facing them.  *D.C. v. Wesby*, 583 U.S. 48, 63 (2018); *Bell v. City of Southfield*, 37 F.4th 362, 367–68 (6th Cir. 2022).

Finley can't.  *No* binding case holds that it's unconstitutional to place mentally ill inmates in segregation.  Finley and the majority concede as much.  That should end the discussion. *Wesby*, 583 U.S. at 63.

Yet the majority concludes otherwise.  How?  By pointing to two cases holding that mentally ill inmates have a right to receive psychiatric care: *Comstock v. McCrary*, 273 F.3d 693 (6th Cir. 2001), and *Clark-Murphy v. Foreback*, 439 F.3d 280 (6th Cir. 2006).  Right off the bat, these cases are an odd fit.  Both are medical-needs cases.  Finley, by contrast, raises a conditions-of-confinement claim.  That is, he alleges defendants housed him in the wrong type of cell, not that they failed to treat his mental health.  *See* R. 10, Pg. ID 65 (challenging the transfer to solitary confinement without mentioning medical care).  It's easy to see why:  Finley received

a host of medical care—an assigned psychiatrist, medicine, antipsychotic shots, therapy, temporary housing in a suicide observation cell, weekly evaluations while in segregation, and eventual placement in a treatment center.   And he's made no effort to show that care was inadequate.

To be sure, the medical-needs and conditions-of-confinement theories are related.   Both are ways Finley might show his incarceration entailed an "extreme deprivation[]" of a basic need:  medical treatment in the former, and safe housing in the latter.   *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992).   But the theories deal with different rights.   In medical-needs cases, the relevant right has little to do with an inmate's segregation status, and everything to do with whether the prison provided adequate medical care.   *See Comstock*, 273 F.3d at 708–09 (discussing the "grossly inadequate" psychiatric evaluation, not the placement in segregation); *see also Estelle v. Gamble*, 429 U.S. 97, 101, 107–08 (1976) (dismissing a medical-needs claim without discussing a segregation placement but suggesting a conditions-of-confinement claim might proceed).   Finley instead asserts a right not to be housed in segregation at all—regardless of the medical treatment he received.   *See* R. 10, Pg. ID 65.   Thus, medical-needs cases like *Comstock* and *Clark-Murphy* can't help Finley.   They say nothing about the constitutionality of his housing.

Labels aside, the majority's cases don't apply on their own terms.   In *Comstock*, we said "the right at issue in this case" is the "right to continuing medical treatment once a prisoner has been determined to be suicidal."  273 F.3d at 711.   We allowed the inmate to proceed against his prison doctor because the doctor neglected his "affirmative duty to offer reasonable medical care."   *Id.* at 702, 711 (quotation omitted).   Similarly, in *Clark-Murphy*, an inmate sued prison guards who knew his mental state was severely declining but failed to do anything to help.  439 F.3d at 289–90.   That, we held, violated the inmate's "right to psychological treatment."   *Id.* at 292.   Again, Finley hasn't claimed defendants denied him psychological treatment.   So *Comstock* and *Clark-Murphy* don't apply to his claim, let alone clearly establish that defendants shouldn't have housed him in segregation.

The majority's solution to this predicament is to climb to a "less granular" and "[r]elatively broad" level of generality.   Maj. Op. at 20.   *But see Wesby*, 583 U.S. at 63

(instructing courts to use "a high degree of specificity"). Because *Comstock* and *Clark-Murphy* prevent officials from failing to treat an inmate's illness in one manner (failing to properly evaluate or monitor the inmate), the majority reasons it must be unconstitutional for an official to knowingly exacerbate the illness in another manner (housing the inmate in segregation). But that's exactly the type of inferential step the Supreme Court has "repeatedly stressed" needs to be spelled out in binding caselaw. *Wesby*, 583 U.S. at 63. Otherwise, the unlawfulness of defendants' conduct doesn't "follow immediately" from the precedent. *Id.* at 63–64 (quotation omitted).

Even if prison wardens were expected to perform this type of off-the-cuff legal analysis, the inference isn't sound. Not every action that knowingly exacerbates an inmate's mental health is unconstitutional—even if the inmate is constitutionally entitled to psychiatric care. *Comstock* might require a doctor to evaluate suicidal inmates, but that doesn't mean it's unconstitutional for an official to loan the inmate a razor and monitor him while he shaves. Or to segregate the inmate when he threatens to harm his cellmate. That's because the constitutionality of the conduct depends on the size of the risk, the nature of the risk, and the officials' response to the risk. *See Hudson*, 503 U.S. at 9 (requiring "extreme" deprivations of basic needs); *Farmer v. Brennan*, 511 U.S. 825, 844 (1994) (no liability if defendants "responded reasonably" to the risk). And because those factors affect the constitutionality of an officer's action, the clearly established analysis must account for them, too.

So even if *Comstock* and *Clark-Murphy* required defendants to treat Finley's mental illness, Finley must still find a case holding (a) segregation poses risks that rise to an unconstitutional level and (b) defendants' reactions to those risks, including their mitigation efforts and reliance on mental-health professionals, were unreasonable. *Comstock* and *Clark-Murphy* don't come close. Thus, even if we could ignore the Supreme Court's instructions, set aside the "particular circumstances" of Finley's case, and climb to a "less granular" level of generality, defendants are still entitled to qualified immunity.

One final point on the clearly established inquiry. The majority justifies its climb to a high level of generality by pointing to the merits of the Eighth Amendment analysis. As part of that analysis, we ask whether defendants "knew" their conduct posed "a substantial risk" of

harm.  *Farmer*, 511 U.S. at 844.  Because that accounts for the official's subjective culpability, the majority says it's "justifie[d]" in using a broader level of generality in Eighth Amendment cases.  Maj. Op. at 20.

That reasoning has two problems.  First, knowing that an action is risky is different from knowing that an action is unlawful.  While the merits deal with the former, the clearly established prong deals with the latter.  *Compare Farmer*, 511 U.S. at 847 (knowledge "of a substantial risk"), *with Anderson*, 483 U.S. at 640 (constructive knowledge of "the unlawfulness" of conduct).  Second, the merits ask whether an official "subjectively" knew her conduct was risky.  *Farmer*, 511 U.S. at 829.  By contrast, "subjective beliefs . . . are irrelevant" to the clearly established prong.  *Anderson*, 483 U.S. at 641.  Thus, the fact that the merits account for an officer's subjective culpability has no bearing on whether a right is clearly established.  And nothing about the merits' subjective prong justifies a lower bar on the clearly established inquiry.

In sum, to allow Finley's claim to proceed, the majority bypasses the Supreme Court's instructions, draws an unsound inference, and offers a doubly erroneous justification.  As a result, the warden's already difficult task is made even harder.  Approximately 20% of male Michigan inmates show symptoms of severe mental illness.[1]  If these inmates can't be placed in segregation, what are wardens to do when they threaten safety?  Keep them in general population and put others at risk?  That might be unconstitutional.  Move them to intensive treatment centers?  But what if, as here, medical staff decline to refer the inmates to the center?  Or what if, as here, the center lacks space or resources to accommodate the inmates?  Are wardens expected to second-guess the medical staff's judgments?  Or to divert resources from other needed programs?  Those options might invite their own set of deliberate-indifference suits.  Nothing in the Constitution forces wardens into such a quandary.  And qualified immunity certainly gives them more leeway to find a solution.

---

[1]Brant E. Fries, *Independent Study of Mental Health and Substance Abuse*, 32–33 (Feb. 16, 2010), www.michigan.gov/-/media/Project/Websites/corrections/assets/Folder14/2010_Boilerplate_302_Final_Version.pdf.

II.

I agree with the majority that Finley's remaining claims fail. Finley's due process claim fails because Finley received all the process that could possibly be due. Unlike the majority, however, I wouldn't decide whether Finley had a liberty interest in the first place. To resolve that difficult issue, the majority concludes that mentally ill inmates have different liberty interests than their healthy peers. *See* Maj. Op. at 27.

Several questions give me pause about that conclusion. To determine whether a liberty interest exists, we compare the "nature" and "duration" of segregation to typical prison conditions. *Harden-Bey v. Rutter*, 524 F.3d 789, 792 (6th Cir. 2008). How does an inmate's subjective perception of segregation affect either attribute? When does the mental cost of segregation become "atypical?" Does it depend on the diagnosis? What if the prison gets the diagnosis wrong? And how are officials to know—must they evaluate an inmate's mental health before knowing what process is due? Finally, the underlying liberty interest is "limited to freedom from restraint." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). When the conditions of segregation are the same for everyone, doesn't segregation pose the same restraints on everyone's freedom?

The majority doesn't resolve these difficult questions. Without answers to them, I wouldn't decide whether Finley's mental illness engendered a liberty interest.

\*       \*       \*

All of Finley's claims should be dismissed. I dissent from the majority's contrary disposition of Finley's Eighth Amendment claim. And with the caveat on liberty interest, I concur in the remainder.